GEORGE G. FOX COMPANY *vs.* BEST BAKING COMPANY
& others.

SAME *vs.* LESLIE A. FRIEND & another.

Suffolk. January 19, 1911. — May 22, 1911.

Present: KNOWLTON, C. J., MORTON, LORING, BRALEY, & RUGG, JJ.

*Unfair Competition. Equity Jurisdiction,* To restrain unfair competition, Plaintiff must have "clean hands." *Equity Pleading and Practice,* Master's report.

A manufacturer of bread brought a suit in equity to restrain another manufacturer from offering for sale loaves of bread so closely resembling the loaves manufactured by the plaintiff as to be likely to mislead the ordinary purchaser into thinking that the defendant's bread was the plaintiff's bread, and this court held, in *George G. Fox Co.* v. *Hathaway,* 199 Mass. 99, that the plaintiff was entitled to an injunction because the loaves offered for sale by the defendant did resemble those manufactured by the plaintiff as the plaintiff alleged and the defendant did not take adequate precautions to distinguish them. In a subsequent suit of the same character by the same plaintiff against a different defendant, a master found that "the defendant's loaves . . . are, except for slight differences in the labels, substantially the same in appearance as those in question" in the first suit, but that, "upon all the facts . . . the defendant's loaves . . . were not so similar to" those manufactured by the plaintiff "as to be likely to deceive the ordinary purchaser, having some knowledge of the appearance" of the loaves manufactured by the plaintiff, "or to constitute an instrument of fraud in the hands of the retail dealer." *Held,* that the finding of the master was plainly wrong and that exceptions thereto must be sustained.

The decision of this court in *George G. Fox Co.* v. *Hathaway,* 199 Mass. 99, that a manufacturer of bread in loaves of a peculiar shape, whose bread had gained a wide and favorable reputation and was known by its visual appearance, due, among other reasons, to its shape, which was "uneconomical, and less convenient and satisfactory generally for the cutting of slices for all kinds of uses than the shapes generally adopted," could maintain a suit in equity to enjoin another baker from offering for sale bread so similar to his as to deceive the ordinary purchaser, was *held* to apply in this case, which was a suit of the same character by the same plaintiff against a different defendant, and in which a master to whom the suit was referred found that the defendant was offering for sale loaves which, "except for slight differences in labels," were "substantially the same in appearance as those in" the first suit, although the master also found "that loaves of that shape were on the whole advantageous loaves to both the plaintiff and the defendant;" because the decision in the first case did not depend on the fact that the loaves manufactured by the plaintiff were "uneconomical," or "less convenient and satisfactory generally for the cutting of slices for all kinds of uses than the shapes generally adopted."

Although a manufacturer of bread has no exclusive right to manufacture and sell loaves of a peculiar size, shape and visual appearance for which he has gained a wide and favorable reputation, and other manufacturers and dealers can

manufacture and sell loaves of the same size, shape and visual appearance if they adopt adequate means of distinguishing their loaves from those of the first manufacturer so that the ordinary purchaser will not be deceived, the first manufacturer by a suit in equity can enjoin any one from offering for sale without adequate distinguishing marks or characteristics loaves so similar to his as to be likely to mislead the ordinary purchaser into thinking that the defendant's bread was the plaintiff's.

In a suit in equity by a manufacturer of bread to restrain another manufacturer from making and selling loaves of bread so similar to the plaintiff's in size, shape and visual appearance as to deceive the ordinary purchaser, it appeared that at one time the plaintiff had been deceiving the public by false and misleading advertisements as to the bread he manufactured, but that he had ceased to do so about a year and a half before the bringing of the suit. *Held*, that such facts alone did not prevent the plaintiff from maintaining the suit.

Two BILLS IN EQUITY, filed in the Superior Court on June 4, 1908, substantially alike excepting for the names of the parties defendant, seeking to restrain the defendants from offering, exposing or selling bread in a loaf having the general visual appearance of a loaf manufactured and sold by the plaintiff under the name " Creamalt."

The cases were referred to Charles E. Shattuck, Esquire, as master. Besides making the findings stated in the opinion, the master found, as the basis of his conclusion " that the defendants' loaves, without any bands or names upon or about them, were not so similar to the ' Creamalt ' loaf as to be likely to deceive the ordinary purchaser, having some knowledge of the appearance of the ' Creamalt ' loaf, or to constitute an instrument of fraud in the hands of the retail dealer," the following facts:

Upon the loaf of bread manufactured by the plaintiff was pasted a label, one and five eighths inches long and three quarters of an inch wide, containing the words,

Made with Milk and Malt

Creamalt

Reg. U. S. Pat. Off.

Geo. G. Fox Co.

The loaf manufactured by the plaintiff is described in the opinion.

Impressed upon the bottoms of the loaves offered for sale by the defendants were the words, " Best," or " Friend." " They were of about the same weight or size as the ' Creamalt ' loaf, belonging to the same class of loaves, namely, the ten cent

loaf designed by bakers for the grocery and other retail trade as distinguished from the restaurant trade. They had the same rounded and slightly flaring sides as the 'Creamalt' loaf. Their upper surface was also glazed as was that of the 'Creamalt' and other loaves commonly sold in this market. On the other hand, the defendants' loaves differed from the 'Creamalt' loaf in that their tops were less rounded and in that the ends of the defendants' loaves were square instead of round, and consequently their corners were square, or at an angle, rather than round. This difference gave the defendants' loaves taken as a whole, rather a different appearance from the 'Creamalt' loaf, because it impaired their oval shape, and in that way distinguished them from a loaf of which the most noticeable peculiarity was its oval shape."

About the central portion of each loaf of the defendants, before it left the factory, was wrapped a paper band about two and one eighth inches wide. The bands were not attached to the loaves and could easily be removed without defacing the loaves. Upon each band manufactured by the defendants in the first case was printed or engraved the following:

Best's

Rich in Cream

Finest    Log Cabin Loaf    Flavor

Malted.

The name "Friend's" appeared instead of "Best's" on the loaves manufactured by the defendant in the second case.

"The defendants' loaves, . . . except for slight differences in the labels, are substantially the same in appearance as those in question in [George G.] Fox [Co.] vs. Hathaway, [199 Mass. 99], but as the evidence presented in that case with regard to the similarity of the plaintiff's and the defendants' loaves may have differed in some respects from the evidence in these cases, I find, purely as matter of fact on the evidence before me, as follows: — The names 'Best' and 'Friend' stamped upon the bottoms of the defendants' loaves would not in themselves have been sufficient to distinguish their loaves from the 'Creamalt' loaf. They were in an inconspicuous position, were often wholly

or partially illegible, and would not be likely to attract the attention of the ordinary buyer. The bands placed around the defendants' loaves would, if they remained upon the loaves while in the hands of the retail dealers, be sufficient to distinguish them from the 'Creamalt' loaf; but as they were not attached to the bread and could easily be removed by a dishonest retailer, they would not be an adequate means of distinguishing the loaves, provided they were not otherwise distinguishable in appearance, and provided it was the defendants' duty to distinguish them.

"But it seems to me that wholly apart from the names on the bottom of the defendants' loaves and the bands around them, the ordinary purchaser, having some knowledge of the appearance of 'Creamalt' bread, either from having bought it or from having seen advertisements and pictures of it, would have no difficulty in distinguishing the 'Log Cabin' from the 'Creamalt' loaves. Excluding the French and Vienna breads, most of the ten cent loaves sold in the retail stores have some points of resemblance. They all have somewhat rounded tops and flat bottoms. A large proportion have glazed tops. They are all of about the same weight. The prominent characteristics of the 'Creamalt' loaf were, as above stated, its oval contour, much rounded top and flaring sides, together with its more perfect glazing — the whole giving an appearance of size or bulk. While the 'Log Cabin' loaves had curved and flaring sides they had square ends and a less rounded top, and therefore lacked the distinct oval appearance of the 'Creamalt' loaf and did not give the same impression of large size. Nor did it appear that the gloss and color of the top of the 'Log Cabin' loaves were the same as those of the top of the 'Creamalt' loaf. Moreover, the label pasted on each loaf of 'Creamalt' bread and appearing in the advertised pictures of it served appreciably to distinguish it from the 'Log Cabin' and other ten cent loaves."

The plaintiff excepted to the master's report upon the following grounds among others:

"1. For that the master has not found, as requested by the plaintiff, that the public had learned to recognize the plaintiff's 'Creamalt' loaves by their general visual appearance."

"3. For that the master has not found that the defendants'

loaves were so similar in appearance to the plaintiff's as to be likely to deceive the ordinary purchaser.

" 4.  For that the master has found that the defendants' loaves without any bands or names upon them were not so similar to the ' Creamalt' loaf as to be likely to deceive the ordinary purchaser having some knowledge of the appearance of the ' Creamalt' loaf, or to constitute an instrument of fraud in the hands of retail dealers.

" 5.  For that the master has found that the defendants' loaves were not so similar to the ' Creamalt' loaf as to be likely to deceive the ordinary purchaser having some knowledge of the appearance of the plaintiff's ' Creamalt' loaf."

" 12.  For that the master has not found, upon the pleadings and the facts reported, that the loaves of the defendants were so similar in appearance to the plaintiff's as to be calculated to deceive the ordinary purchaser and to make the loaves of the defendants an instrument of fraud in the hands of retail dealers."

The defendants filed numerous exceptions.

The cases were heard by *Pierce,* J., upon the exceptions to the master's report, and an order was made that the exceptions of all parties be overruled and a decree be entered dismissing the bills ; and, by agreement of the parties, the cases were reported to this court for determination.

*O. Mitchell,* (*J. T. Brennan & James J. McCarthy* with him,) for the plaintiff.

*G. W. Anderson,* (*W. C. Rogers* with him,) for the defendants.

LORING, J.    These bills are brought by the plaintiff in *George G. Fox Co.* v. *Glynn,* 191 Mass. 344, and in *George G. Fox Co.* v. *Hathaway,* 199 Mass. 99.    The master in the case at bar has found (1) that the defendants began to sell the loaves here complained of " soon after the decree of the Superior Court of this County [referred to in these bills] dismissing the bill in the case of the *George F.* [*sic*] *Fox Company* v. *Hathaway,* was entered," and (2) that " The defendants' loaves here in question are, except for slight differences in the labels, substantially the same in appearance as those in question in *Fox* [*sic*] v. *Hathaway* "; but in the words of his report, (3) " Upon all the facts,

as above stated and upon an inspection of the exhibits in the cases, I therefore find that the defendants' loaves, without any bands or names upon or about them were not so similar to the ' Creamalt' loaf as to be likely to deceive the ordinary purchaser, having some knowledge of the appearance of the ' Creamalt' loaf, or to constitute an instrument of fraud in the hands of the retail dealer." In *George G. Fox Co.* v. *Hathaway*, we found as a fact that the visual appearance of the loaf there in question, which was "substantially the same in appearance" as that in question in the two suits now before us, was likely to mislead the ordinary purchaser into thinking that the defendants' bread was the plaintiff's bread. We adhere to our former finding. The master was plainly wrong in the last of the three findings stated above, and the plaintiff's first, third, fourth and fifth exceptions to his report must be sustained.

The defendants contend that for two reasons this does not bring these two cases within the decision in *George G. Fox Co.* v. *Hathaway, ubi supra.* The first of these reasons is that it appeared in the Hathaway case " that the oval shape adopted by the plaintiff was uncommon, although not entirely novel, and that it was uneconomical, and less convenient and satisfactory generally for the cutting of slices for all kinds of uses than the shapes generally adopted. There was nothing to show that the defendants' business interests required the combination of this shape with the same size, color and general visual appearance that had become associated with the plaintiff's trade in this ' Creamalt' bread," while in the cases now before us it has been found as a fact that the oval-shaped loaf with its flaring sides and exaggerated rounding of the top is on the whole an advantageous loaf and for the following reasons: (1) It has an appearance of bulk and size which no other loaf of the same weight has and therefore purchasers who wish to get as much as possible for their money prefer it: (2) It has a handsome and attractive appearance: (3) Its rounded corners are less likely to be broken in transportation and the pans are more easily cleaned: (4) Although it is a fact that it is less adapted to being cut into uniform slices, that fact is of little importance in the "family trade," for which the plaintiff's and the defendants' loaves are primarily intended.

The fact in the Hathaway case that the plaintiff's oval-shaped loaf was an uneconomical loaf and generally less convenient and satisfactory was spoken of because since that was the fact the case there presented was not a case of conflicting rights, but a case where the only explanation of the defendants' adopting the oval-shaped loaf was that they hoped to take advantage of the plaintiff's good will and to pass off their bread as the plaintiff's bread.   There is nothing in that opinion which implies that if it had been found there as a fact that the oval shaped loaf was a desirable one the opposite result would have been reached. Not only that, but it is there stated in terms that the opposite result would not have been reached had that been the fact. After setting forth that the oval shaped loaf was an undesirable one and that there was nothing to show that the defendants' business interests required the adoption of it, this court went on to say : " The plaintiff had no exclusive right in any one of the features of the combination, and if the defendants had required the use of this combination for the successful prosecution of their business, they would have had a right to use it, by taking such precautions as would prevent deception of the public and interference with the plaintiff's good will."

The second ground on which the defendants seek to take the cases at bar out of the decision in the Hathaway case lies in the fact that the master has found that " If the fact is material . . . the defendants, perceiving that a loaf like the ' Creamalt ' loaf, with rounded and flaring sides, suited the public taste or whim, and desiring to meet the competition of the ' Creamalt ' loaf, decided to make a loaf having such rounded and flaring sides." The plaintiff has no exclusive right to make and sell bread having an oval shape, flaring sides and an exaggerated rounding of the top.   And the defendants would have a right to make and sell bread which has that shape were it not for the fact that bread of that shape means to the public that it is made by the plaintiff. . From this it follows (as was decided in *Flagg Manuf. Co.* v. *Holway,* 178 Mass. 83, and as was stated in that part of the opinion of this court in *George G. Fox Co.* v. *Hathaway* quoted above) that the defendants can use that shape of loaf if they take such precautions as will prevent their bread from being taken for the plaintiff's bread.   The only precautions

taken by them in these cases consist in stamping their names on the bottom of the loaves and placing bands around them. But the master has found in terms that these two means of distinguishing the defendants' loaves from the plaintiff's loaves "would not be an adequate means of distinguishing the loaves."

We are therefore of opinion that there is nothing in these cases which takes them out of the decision in *George G. Fox Co.* v. *Hathaway*, 199 Mass. 99, and that the twelfth exception to the master's report must be sustained.

A new defense, however, is set up, namely, that the plaintiff does not come with clean hands. The master has found (first) that the representation made by the plaintiff as to the ingredients of the bread is that it is made of milk and malt unless calling it "Creamalt" "may be taken to connote the use of pure cream." In our opinion it does not. Secondly, the master found that when the bill was filed "the plaintiff widely advertised 'Creamalt' bread as the 'new bread made with milk and malt.'" The findings of the master are that the plaintiff used malt as one of the ingredients of its bread because "it was also thought by the plaintiff to impart a desirable flavor to the bread," and that "the ingredients used in making 'Creamalt' bread were of good quality and were skilfully combined and baked, in accordance with a formula devised by the plaintiff's agents as the result of experiments." The bread therefore appears to have been made according to a new formula, and so might be fairly termed a new bread, although all the ingredients had been used in combination before in making bread. Thirdly. Up to and including the year 1906 the plaintiff did make misrepresentations of fact with respect to its "Creamalt" bread. It advertised that "It has twice the food value of any other bread." And there were other similar misrepresentations. But these advertisements had been stopped nearly a year and a half before these bills were filed on June 4, 1908. Although it is not so found in terms, we take it to be the fact on the findings made by the master that the increase in the plaintiff's daily sales from "about one hundred loaves" to "about six thousand loaves" may have come in some degree from these false representations. Notwithstanding that, the plaintiff has built up a large and remunerative business in selling a good bread which

the public like, and the defendants have put upon the market an imitation of its loaves, adapted to use in deceiving that part of the public who had only a general knowledge and recollection of that which had been recommended to them, or which they had been accustomed to buy.  The question we have to decide is whether the plaintiff who, for nearly a year and a half before the bill was filed, stopped all advertisements which were not true, is to be precluded from having the defendants enjoined from selling their bread as the plaintiff's bread because some of its former advertisements contained statements which were not true.  In our opinion that would be going too far, and the only authorities we have seen are to that effect.  *Moxie Nerve Food Co.* v. *Modox Co.* 153 Fed. Rep. 487.  *Benedictus* v. *Sullivan, Powell & Co.* 12 R. P. C. 25.

The orders overruling the first, third, fourth, fifth and twelfth exceptions to the master's report taken by the plaintiff must be reversed and said exceptions must be sustained.  The orders for decrees dismissing the bills must be reversed and decrees entered in favor of the plaintiff.

*So ordered.*