## AMERICAN THERMOS BOTTLE CO. v. W. T. GRANT CO.*

(District Court, D. Massachusetts. February 25, 1922.)

### No. 1133.

1. **Trade-marks and trade-names and unfair competition ⬯40—Rescission of contract to manufacture marked bottles for owner of trade-mark held to destroy manufacturers' right to sell the same.**

    Where a manufacturer of vacuum bottles bearing plaintiff's trade-mark rescinded the contract for plaintiff's failure to make an advance payment, instead of standing on its breach under the contract, the legal status existing was as if no contract ever had been made, and the manufacturer had no right to sell bottles in its possession so marked.

2. **Trade-marks and trade-names and unfair competition ⬯85(1)—Inaccurate, but immaterial, statements in advertising held not to prevent suit to restrain another from using trade-name.**

    A dealer in vacuum bottles had a right to use its trade-name in connection with goods which were in substantial part manufactured by others, if the assembling and inspection were done by it so that the marked article was really its output, and in a suit to restrain sale of articles marked with such trade-mark, a defense that plaintiff had fraudulently used its trade-mark by advertising that its goods were manufactured by it, when in fact they were in considerable part bought from other American manufacturers, was without merit.

3. **Trade-marks and trade-names and unfair competition ⬯85(1)—Dealer held to have intended to palm off foreign-made goods as American-made.**

    Under Comp. St. §§ 5297, 5298, and probably without such statutes, it is a duty of a dealer to mark its goods of foreign origin, so that purchasers can readily distinguish them from goods of American origin, and a dealer in vacuum bottles, which were substantially foreign-made, with parts from foreign countries marked with adherent paper stamps, detachable in the process of assembling, or by print so fine that it could not be noticed, could not be found not to have intended the palming off of foreign-made goods as American-made, in an action to restrain use of its trade-mark.

4. **Trade-marks and trade-names and unfair competition ⬯23—Trade-mark not a right in gross or at large.**

    A trade-mark is not a right in gross or at large like a statutory copyright or a patent; its function simply being to designate the goods as the product of a particular trade and to protect good will against the sale of another's product as that of the owner of the trade-mark.

5. **Trade-marks and trade-names and unfair competition ⬯85(1)—Trade-mark used in deceptive merchandising not protected.**

    One who has been using a trade-mark in deceptive merchandising is not entitled to have such name protected in equity, under Comp. St. § 9506.

---

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Decree affirmed 281 Fed. —.

**6. Trademarks and trade-names and unfair competition ⊜⇒85(1)—Defendant in pari delicto with plaintiff, suing to restrain use of trade-mark, will prevail because of paramount public interest.**

A seller of vacuum bottles bearing the trade-mark of another will prevail in a suit by such other to enjoin the use of the trade-mark, when the defendant was in pari delicto in having manufactured the bottles for the plaintiff under a rescinded contract for the purpose of deceiving the public as to their foreign origin, in violation of Comp. St. §§ 5297, 5298, not by reason of its own merits, but because of the demerits of the plaintiff, and because of paramount public interest.

**7. Trade-marks and trade-names and unfair competition ⊜⇒85(1)—Whether party suing to restrain use of trade-mark comes into court with clean hands determined by facts existing when suit begun.**

In determining whether one suing to restrain use of trade-mark comes into court with clean hands, only the facts as they exist when suit begins may be considered, and it is immaterial that such plaintiff under different conditions and at an earlier time used the trade-mark in deceiving the public.

In Equity. Suit by the American Thermos Bottle Company against the W. T. Grant Company. Preliminary injunction dissolved.

Robert B. Killgore, of New York City, and Charles F. Rowley, and Peabody, Brown, Rowley & Storey, all of Boston, Mass., for plaintiff. Arthur Black, of Boston, Mass., for defendant.

ANDERSON, Circuit Judge. 1. This is a trade-mark infringement case. On June 27, 1921, the parties stipulated, inter alia, that the plaintiff is the owner of the trade-mark "Thermos" for "double-walled vacuum vessels with vacuum between the walls," etc., duly registered in the United States Patent Office January 7, 1908, certificate 67,002. Belatedly defendant's counsel suggests that "Thermos" is a descriptive word, and that the trade-mark is therefore not valid. This issue was not pleaded, if it needs to be. When the stipulation was made, the parties probably intended by implication to cover the validity as well as the ownership of the trade-mark. The question is not absolutely free from doubt. The vacuum bottles are vessels excluding and including heat, and in that aspect "Thermos" is descriptive. There is no evidence in the record that Thermos means to the public vacuum bottles produced by the plaintiff. Compare Coca-Cola Co. v. Koke Co., 254 U. S. 143, 146, 41 Sup. Ct. 113, 65 L. Ed. 189. For present purposes I assume without deciding that the plaintiff has a valid trade-mark.

2. The defenses really relied upon are two:

(a) That the plaintiff procured and induced the use of its trade-mark on the goods in question, and therefore cannot now be heard to complain of such use.

(b) That the plaintiff does not come into court with clean hands, in that it is alleged to have so fraudulently used its trade-mark in connection with the sale of goods of foreign origin as to mislead the purchasing public.

3. The first contention, (a), that the plaintiff procured and induced the use of its trade-mark on the goods in question, is grounded on a

contract, and relations arising from that contract, between the plaintiff and the American Steel Export Company, dated December 6, 1920. The Export Company is not a defendant. but it has obviously, apparently admittedly, assumed the defense of this case.   The exact relations between the Export Company and the Grant Company have not been disclosed.   It is a fair inference that the Grant Company has either bought the goods in question from the Export Company, or that it is marketing them for the Export Company.   It is not claimed that the defendant's rights as to the use of the plaintiff's trade-mark are greater than those of the Export Company.

The contract of December 6, 1920, relates to the purchase by the plaintiff from the Export Company of German-made fillers and vacuum bottles:   600,000 pint thermos fillers identical with a sample marked "Schmidt Pint Filler No. 1," to be shipped from a European port at the rate of 100,000 per month for six months, commencing December, 1920; 300,000 quart fillers identical with sample marked "Schmidt Quart Filler No. 2," to be shipped from a European port during six months commencing January, 1921, at the rate of 50,000 per month; and in paragraph 3 for the goods, here involved, 100,000 pint complete aluminum bottles identical with sample marked "Schmidt Full Aluminum Bottle Pint Size No. 3," except to be of seamless aluminum, to be shipped during the six months commencing January, 1921, at the rate of 16,666 per month.   The contract contains provisions that defective or broken bottles are to be credited or replaced at the option of the Export Company.   The contract price of the pint bottles is 50 cents, freight and duty paid; payments for all goods delivered to be 50 per cent. on arrival at New York or any other Atlantic seaboard port, and 50 per cent. within ten days after delivery to carrier at port of arrival.

In paragraph 12 of the contract it is provided that the Export Company "or East European Trading Company, Inc., or any of their connections or agents, will not sell, during the life of this contract, any vacuum bottles or fillers to others than the American Thermos Bottle Company in the United States of America or Canada, without the written consent of the American Thermos Bottle Company."   It thus here, and elsewhere in the evidence, appears that the East European Trading Company and the Export Company are affiliated concerns; just how affiliated does not appear.   This provision manifestly contemplates a continuing control by the plaintiff over at least one channel of supply of German-made vacuum bottles and fillers.

It appears from the agreed statements of fact that after the execution of this contract on December 6, 1920, and prior to the receipt on January 27, 1921, of notice as to rescission, hereinafter referred to, the plaintiff received from the Export Company a large number of pint fillers. "Whether or not the goods so delivered conform to the specifications of the contract is a matter of evidence," so runs the stipulation. But no evidence has been adduced warranting a finding that the fillers did or that they did not conform to the specifications.   It is also stipulated that the plaintiff had not paid the Export Company for any of such fillers so received prior to receipt of the notice of rescission.   The

plaintiff argues that the defendant waived its right to payment of 50 per cent. on receipt of such fillers at port, and that therefore failure to pay was no breach of the contract by the plaintiff. The evidence is insufficient for a finding either for or against such waiver.

But it is agreed that on January 27, 1921, the Export Company gave written notice to the plaintiff that it had defaulted in payment of the contract price of thermos bottle fillers, and that the Export Company "has elected and does hereby elect to rescind, and does hereby rescind, said contract so far as such contract remains unperformed."

On that date, January 27, 1921, none of the complete pint bottles covered by paragraph 3 of the contract had been delivered to the plaintiff. To what extent, if at all, they had been manufactured and marked with the plaintiff's trade-mark, does not appear. Whether they were manufactured for the Export Company under a valid and enforceable contract made with some German concern, does not appear.

Under the contract, the Export Company was to deliver in the month of January 16,666. On this record it is impossible to find that all or any part of the 100,000 complete pint bottles had or had not then been manufactured or marked, either or both. What does appear is that at some time between January 27, 1921, and early June, all, or substantially all, of the 100,000 complete pint bottles were received in the United States and put on the market by the defendant, and perhaps by some other concerns. Eighty-odd thousand of the 100,000 are now held under the preliminary injunction. The balance have apparently been marketed by the defendant and other merchandising concerns.

The defendant advertised these German-made bottles for sale at the retail price of $1 each. One advertisement put in evidence is to the following effect: "Another Grant Triumph [with illustration of the Thermos bottle]." Then: "Thermos trade-mark stamped on each bottle. $2.75 vacuum bottle for $1.00. Ordered by and made for the American Thermos Bottle Company pint size, hot and cold bottle in aluminum case. Special cup top. Perfect in every way. A $2.75 value for only $1.00. First time ever sold at this price."

It will be observed that this advertising, "Ordered by and made for the American Thermos Bottle Company," is nearly, if not quite, an accurate statement. The plaintiff was not attempting to deceive the purchasing public as to the actual origin of the goods, except so far, if at all, as a sale of bottles so marked might deceive. Compare United Drug Co. v. Rectanus Co., 248 U. S. 90, 97, 39 Sup. Ct. 48, 63 L. Ed. 141.

One of these bottles is marked Exhibit A of the Killgore affidavit, and is by reference made a part of this opinion. This and the balance of the 100,000, the subject-matter of this controversy, were marked on the bottom in accordance with an arrangement made between the plaintiff and the Export Company in December, 1920, after the contract was made. The contract is silent as to marking. The Export Company then submitted a sketch showing the proposed stamping for the 100,000 complete pint bottles called for by the contract. This sketch, substantially larger than the bottom of the bottle, contained, as submitted to the plaintiff, the words:

"Thermos

"Trade-Mark
"Germany

"Pat. Nos.

"13093 Mch. 15, '10

"38834 Sept. 24, '07"

The plaintiff's president, Walker, thereupon wrote in the circular margin, "American Thermos Bottle Company, Norwich, Conn., U. S. A.," and with this insertion approved the sketch on December 30, 1920. Parol evidence and a letter of the Export Company to the plaintiff both show that the parties to the contract intended that the word "Germany" should be "in as small letters as possible." Both parties, as the evidence conclusively shows, realized that German-made goods .were particularly unpopular in this country at that time, and both intended that the marking on these German-made goods should be as inconspicuous as might barely pass the customs officials as being a compliance with section 5297, Compiled Stats., providing for marking articles and packages to indicate the country of origin. This statute is quoted and discussed below.

The goods were marked exactly as the plaintiff intended them to be marked in order that it, the plaintiff, might sell these German-made bottles in this country as its own output. But, as the contract had been rescinded by the Export Company on January 27, 1921, and, as already stated, it does not appear that on that date the goods in question had either been manufactured or marked (or that they had not), it cannot be found that the plaintiff actually procured either the marking or the importation of these goods. For aught that appears, these bottles may not have been in existence on January 27, 1921, when the contract ceased to exist.

Probably the fair inference is that the goods were not so marked, even if manufactured, until after January 27, 1921; for after this case was partially heard in June, 1921, at the defendant's own suggestion, the case was continued, in order that the defendant might take evidence in Germany to show that the goods had before the rescission on January 27, 1921, been manufactured and marked as now complained of. But when the trial of the case was resumed in January, 1922, no evidence from Germany or elsewhere was adduced in support of the contention urged by defendant's counsel in June. Defendant's counsel has now shifted his position, and contends, in effect, that it is for the plaintiff, not the defendant, to show that the goods in question had not been manufactured and marked prior to the rescission of January 27, 1921. I do not think that proposition can be sustained. It is true that, if the bottles were in stock, so that all that remained was to stamp them with the design approved by the plaintiff on December 30, 1920, all of the bottles might easily have been so marked before January 27, 1921.

[1] But a fundamental difficulty is that, assuming that defendant is in the shoes of the Export Company, the Export Company, by electing to rescind on the ground that the plaintiff had broken the contract by failure to make the payment for the fillers delivered in December, left

itself, as to the unperformed part of the contract, as though no contract had ever been made. The bottles, even if manufactured and marked, had not on that date been delivered or tendered for delivery. It did not claim a breach and stand on this breach under the contract. It claimed a breach authorizing it to rescind, and undertook to rescind the contract. That left it, I think, as to goods on hand not delivered or tendered for delivery, in the legal status that would have existed if no contract had ever been made. Rescission wipes out a contract. It follows that the goods now in question were in the Export Company's possession or control, and, if marked with the plaintiff's trade-mark, were so marked without any authority emanating from the plaintiff so to mark them. Otherwise stated, assuming that, because of the contract, the Export Company had marked the goods in accordance with the plaintiff's desire before the contract was rescinded, its rescission of the contract left the goods in its hands with no rights accruing out of the contract status as to the use of the plaintiff's trade-mark.

[2] The defendant's second contention, (b), that the plaintiff is not in court with clean hands, raises a far more difficult question of mixed law and fact, and requires a consideration of the evidence which, on many material points, is meager and unsatisfactory.

At the outset the defendant contends that the plaintiff has fraudulently used its trade-mark by advertising that its goods were manufactured by it at "Norwich, Conn., U. S. A.," when, in fact, they were in substantial part bought from other American manufacturers and there assembled.

I am not impressed by that contention. I think that the plaintiff had a right to use its trade-name in connection with goods which were in substantial part manufactured by others, if the assembling and inspection were made by the plaintiff, so that the marketed article was really the plaintiff's output. Of course, the function of trade-marks is to denote origin. But origin is not limited to the actual manufacture of every constituent element of the trade-marked article. Undoubtedly the plaintiff has been a somewhat boastful advertiser, and has emphasized its position as an *American* Thermos Bottle Company. If mere boasting were held fraud, few trade-marks would survive. Apart from its importations of foreign goods, I think its advertising and use of the trade-mark fall within the limits of excusable merchandising practices. At most, such emphasis on its factories in America, lend color to its conduct referred to below in importing and marking foreign-made fillers and bottles.

[3] But the difficulty grows out of the use of its trade-mark and its advertising in connection with the importation of foreign-made fillers and bottles. It is plainly the duty of the plaintiff to mark its goods of foreign origin so that the purchasing public may know that they were of foreign, and not of American, origin. Such duty would probably have accrued as to the plaintiff's trade-mark, in the advertising of which "American Thermos Bottle Company, Norwich, Conn., U. S. A.," has always prominently figured, even if there were no statute. But there is a statute. Compiled Stats. § 5297, F, subsection 1, is as follows:

"All articles of foreign manufacture or production, which are capable of being marked, stamped, branded, or labeled, without injury, shall be marked, stamped, branded, or labeled in legible English words, in a conspicuous place that shall not be covered or obscured by any subsequent attachments or arrangements, so as to indicate the country of origin. Said marking, stamping, branding, or labeling shall be as nearly indelible and permanent as the nature of the article will permit.

"All packages containing imported articles shall be marked, stamped, branded, or labeled so as to indicate legibly and plainly, in English words, the country of origin and the quantity of their contents, and until marked in accordance with the directions prescribed in this section no articles or packages shall be delivered to the importer.

"Should any article or package of imported merchandise be marked, stamped, banded, or labeled so as not accurately to indicate the quantity, number or measurement actually contained in such article or package, no delivery of the same shall be made to the importer until the mark, stamp, brand, or label, as the case may be, shall be changed so as to conform to the facts of the case.

"The Secretary of the Treasury shall prescribe the necessary rules and regulations to carry out the foregoing provision."

## Section 5298, F, subsection 2, is as follows:

"If any person shall fraudulently violate any of the provisions of this act relating to the marking, stamping, branding, or labeling of any imported articles or packages; or shall fraudulently deface, destroy, remove, alter, or obliterate any such marks, stamps, brands, or labels with intent to conceal the information given by or contained in such marks, stamps, brands, or labels, he shall upon conviction be fined in any sum not exceeding $5,000, or be imprisoned for any time not exceeding one year, or both."

The plaintiff did not comply with the requirement that the marking on the imported foreign fillers should be "as nearly indelible and permanent as the nature of the article will permit."

During the war it had imported large quantities of Japanese fillers. These fillers, of course, were largely concealed from the purchasing public when sold in the assembled bottles. Some, perhaps all, of them were at some time marked by adhering labels. But it appears in evidence, and it is obvious, that when these fillers are put into a case and tested, as in the process of assembling they were tested, a large share of the labels would become detached. The evidence indicates, and I find, that the plaintiff intended that many of these labels should become detached, so that there would be no general recognition of its use of Japanese fillers. Nor was any evidence offered to the effect that it was impracticable to mark these fillers indelibly as required by the statute. Inferentially, it was entirely practicable so to make them.

Plaintiff also in the fall of 1920 contracted with the East European Trading Company., Inc., for a large quantity (300,000) of German-made fillers, and these also were, at least in part, not marked or labeled as required by the statute. While the evidence does not disclose just how many fillers of foreign origin have been put upon the market, not marked or labeled as required by the statute and for proper use of the trade-mark, the number is very substantial. The plaintiff intended the paper labels "Made in Germany" to be washed off in testing, so that many, probably most, of the bottles with German fillers would go to the market with no indication of foreign origin.

To advertise, as this plaintiff has, "American-made goods for Ameri-

can people keep American workmen busy" not long after the importation and sale of large quantities of Japanese and German goods, made under such labor conditions that these complete pint bottles, then retailing in the United States at $2.25, were contracted to be sold, freight and duty paid, at 50 cents, is not consistent with fair and honest dealing with the purchasing public, when it was deliberately planned so to mark these importations that customers would believe them American-made.

Moreover, as indicated above, the evidence as to the intended use of the trade-mark on the 100,000 complete pint fillers shows, I think conclusively, that the plaintiff intended the word "Germany" to be in such small letters as to amount to a fraud on the statute. Exhibit A shows "Germany" so inconspicuous as to be practically unnoticeable. It is true, as argued, that that fraud was not completed, because of the rescission of the contract; but there is no evidence warranting a finding that the contract relations between the parties were broken because of any change of heart on the plaintiff's part as to marketing German-made goods as American-made goods. While, under certain circumstances, there is undoubtedly a tempus penitentiæ for parties who have planned frauds, there is nothing in this record indicating that these 100,000 bottles were kept off the American market because of a belated, law-abiding spirit on the part of the plaintiff. It intended to use its trade-mark fraudulently in that transaction. Even if it be assumed that mere unperformed intention is not enough to put it out of court, that intention lends color to its actual transactions in the imported Japanese and German fillers marketed in substantial quantities and above referred to.

On this record I cannot find that the plaintiff does not intend to continue the palming off of foreign-made goods as American-made. Plaintiff's president made a substantial purchase of German fillers in the fall of 1921. [4] I am not convinced that it realizes and intends to comply with the requirements of sound business ethics in the use of its trade-mark on foreign goods. Its trade-mark is not a "right in gross or at large like a statutory copyright or a patent"; "its function is simply to designate the goods as the product of a particular trade and to protect his good will against the sale of another's product as his." United Drug Co. v. Rectanus Co., 248 U. S. 90, 97, 39 Sup. Ct. 48, 63 L. Ed. 141.

[5] Plaintiff cannot ask protection against the use by others of a name it has itself been using in deceptive merchandising. The principle is elementary and familiar; the only difficulty is in the application to the specific facts of this case. Compiled Stats. § 9506; Worden v. California Fig Syrup Co., 187 U. S. 516, 23 Sup. Ct. 161, 47 L. Ed. 282; Manhatten Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 41 L. Ed. 706; Coca-Cola Co. v. Koke Co., 254 U. S. 143, 41 Sup. Ct. 113, 65 L. Ed. 189; Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. 581; Leather Cloth Co., Ltd., v. American Leather Cloth Co., Ltd., 4 De G., J. & S. 137; 11 H. L. 523; Hazlett v. Pollack Stogie Co., 195 Fed. 28, 30, 115 C. C. A. 30, 39 L. R. A. (N. S.) 632; Prince Mfg. Co. v. Prince's Metallic Paint Co., 135 N. Y. 24, 38, 31 N. E. 990, 17 L. R. A. 129; Jacobs v. Beecham, 221 U. S. 263, 31 Sup. Ct. 555, 55 L. Ed. 729; Krauss v. Peebles' Sons Co. (C. C.) 58 Fed. 585.

[6] I do not overlook that the Export Company, in whose shoes I think the defendant stands, is, as to the marking of the 100,000 pint bottles, in pari delicto with the plaintiff, and that, in urging wrongdoing by the plaintiff, counsel for the defendant by necessary implication condemns his own client. But in such cases it is the general public or sound public policy that is, so to speak, the client of the court. The public has a vital interest in protecting the honest, proper use of trademarks, and in preventing the dishonest and misleading use of trademarks. In such case the defendant prevails, not on its own merits, but because of the demerits of the plaintiff and because of paramount public interest. Guernsey v. Cook, 120 Mass. 501, 503; Worden v. California Fig Syrup Co., 187 U. S. 516, 529, 23 Sup. Ct. 161, 47 L. Ed. 282; Pidding v. Howe, 8 Simons, 477.

Moreover, on fair analysis, the fact that the defendant is in most respects involved in the same wrongdoing as the plaintiff increases the weight that should be given to the facts which have been elicited. Several of the witnesses impressed me as not being willing to tell with complete fullness and frankness exactly what had occurred concerning the marking and labeling of the foreign importations. The facts expressly shown by the parol evidence acquire, from their origin and manner of presentation, an additional significance. No witness can be suspected of having exaggerated the wrongdoing.

Plaintiff's counsel argued at length that relief should not be denied because of assumed violent anti-German passions engendered by the war. With that view I accord. The issue must be determined on sound principles, generally applicable, unaffected by passion or prejudice. But customers have a right to indulge their tastes, feelings, whims, and even their unreasonable prejudices; a right to make their own choice as to American, English, French, Japanese, or German goods, out of which they may not be cheated by any misbranding, positive or negative. It is no more a question of quality or economics than a man's right to select his own tailor. This right would exist independently of the statute, which asserts a national policy binding on this court. But the fact that there is, or is assumed by the parties to be, a strong prejudice against German-made goods, augments, if anything, the duty of fair dealing and good-faith compliance with the statute. If the purchasing public were indifferent instead of violently prejudiced as to foreign or domestic origin, a plausible argument might, in the absence of the statute, be made that misrepresentation as to such origin, positive or negative, is immaterial. No such contention can be made in these times.

[7] Finally, plaintiff contends that, even if held in the wrong in this case, it should have an opportunity to purge itself and then assert rights in its trade-mark. I accept that view. I do not understand that the doctrine of unpardonable sin applies to such plaintiffs. Indeed, I cannot believe this court, by now holding the plaintiff disentitled by reason of its own misconduct to equitable help, can bind any other court in which the plaintiff may hereafter seek relief from unfair competition in the use of its trade-mark, assuming that it has or shall have a valid trade-mark. "The law of trade-marks is but a part of the broader law

of unfair competition," as Mr. Justice Pitney says in United Drug Co. v. Rectanus Co., 248 U. S. 90, 97, 39 Sup. Ct. 48, 50 (63 L. Ed. 141). In such case "the plaintiff's position must be judged by the facts as they were when the suit was begun, not by the facts of a different condition and an earlier time," by Mr. Justice Holmes in Coca-Cola Co. v. Koke Co., 254 U. S. 143, 147, 41 Sup. Ct. 113, 114 (65 L. Ed. 189). Diamond Crystal Salt Co. v. Worcester Salt Co., 221 Fed. 66, 137 C. C. A. 16; Coca-Cola Co. v. Old Dominion Beverage Corp. (C. C. A.) 271 Fed. 600; Moxie Co. v. Modox Co. et al. (C. C.) 153 Fed. 487; Gaines & Co. v. Turner-Looker Co., 204 Fed. 553, 123 C. C. A. 79; Lambert Pharmacal Co. v. Bolton Chemical Corp. (D. C.) 219 Fed. 325.

On the whole record, I am satisfied that this plaintiff is not entitled to the help of the court in preventing the marketing of the rest of these 100,000 German-made pint vacuum bottles. It is in no position to urge the unfairness of cut-price sales of this importation.

The preliminary injunction must be dissolved. But, as this injunction was granted on condition that the plaintiff should in such case pay the defendant any damage resulting therefrom, the bill must be retained for such further proceedings as law and justice may require.