F. W. DODGE CORPORATION, Plaintiff, *v.* WILLIAM J. COMSTOCK and Others, Defendants.

Supreme Court, Erie County, May 7, 1931.

*Lyman M. Bass,* for the plaintiff.

*John L. Heider,* for the defendants Comstock.

*Paul V. Huston,* in person.

CHARLES B. WHEELER, Official Referee. The plaintiff is a domestic corporation and is engaged in the business of gathering authentic information relating to construction and engineering enterprises and similar undertakings, and furnishing the same to its patrons and subscribers. This information, when secured, is reported to the various offices maintained by the plaintiff, where it is compiled, classified and edited. This information, when so gathered, is reported upon slips of paper, known as "Dodge Reports" and distributed daily through the mail to its subscribers. The plaintiff maintained an office for these purposes in the city of Buffalo, among other cities.

These " Dodge Reports " stated the contemplated project, the selection of an architect, the progress of plans, the taking of bids, lists of bidders, the awarding of contracts and the progress of the work.

Subscribers receiving these reports, wishing to procure business growing out of the projects, were thus supplied with information concerning them, and could act accordingly. The plaintiff's business thus established is a very large and extensive one covering most of the States of the Union.

The uniform contracts made with subscribers contained the following provision, viz.: " It is further expressly agreed by the undersigned (subscriber).

" 1. That all information, whether printed, written or oral, in answer to special inquiry or voluntarily furnished by the said corporation or its agents or employees, shall be held in confidence and for their business only."

Oliver Comstock, one of the defendants, had been in the service and employ of the plaintiff and thus acquired knowledge of the plaintiff's business and the method of conducting it. He left its employ and on or about February 20, 1928, in connection with his father, William J. Comstock, formed a copartnership for the purpose of conducting a business similar to that of the plaintiff under the assumed name of " The Buffalo Construction News."

The plaintiff charges that in the conduct of said business, the defendants have pirated and used the news published by the plaintiff in its reports and used the information so gained in its own reports furnished to the defendants' subscribers, and the plaintiff asks the defendants be enjoined from so doing.

The evidence shows that Paul V. Huston, one of the defendants, is an attorney and counselor at law, practicing his profession in the city of Buffalo. He was counsel for the codefendants, the Comstocks. He subscribed for the " Dodge Reports " and his contract contained the usual clause that such reports should be held in strict confidence. He stated to the plaintiff's agents that the reports to be furnished him were simply to be used in cases where insurance and bonds might be required.

However, in violation of his contract with the plaintiff, Huston did deliver the reports received by him to the " Construction News " and it evidently was for that very purpose he became a subscriber to the " Dodge Reports."

The evidence, we think, fully sustains the finding that the " Construction News " used the reports so obtained through Huston as an aid in making the reports it issued. The defendants practically admit this, although they contend that the " Dodge Reports "

were only used as a lead or tip, and that in each instance with such a lead or tip their reporters visited parties mentioned in such reports, and verified the information given in the " Dodge Reports." The referee is of the opinion that even such a use is condemned by the law.

However, the evidence shows that the use of the " Dodge Reports " was not confined to their use as mere " leads " or " tips." The plaintiff suspected the defendants were using its reports in a more general way, and it accordingly prepared and furnished Huston what has been termed " keyed " reports. These keyed or special reports were doctored, and purposely gave incorrect and fictitious alleged information, and the reports afterwards issued by the " Construction News " contained the same erroneous and fictitious information, showing the keyed reports of the plaintiff had in fact been utilized for the purposes of the " Construction News " reports.

The defense interposed is of a twofold character: *First*, the defendants contend that when the " Dodge Reports " were issued it amounted to publication which permitted their use by the public. *Second*, that the plaintiff itself was guilty of pirating the reports made by the defendants, and, therefore, does not come into court with clean hands, and its application for injunctive relief should be denied.

The plaintiff concedes that prior to January, 1930, it did receive reports of the " Construction News " and made use of them as leads or tips, but in every case went to the sources of information and from such information so obtained wrote up its own reports. However, the evidence is very conclusive that in January, 1930, the home office of the plaintiff gave the Buffalo office explicit orders and instructions that it must not utilize the reports of the construction company for any purpose even as leads or tips, and that any reporter or employee who violated such instructions would be discharged from its service, and that for some nine months up to the time of the commencement of this action, such instructions have been studiously followed and observed.

The defendants, however, claim that notwithstanding the plaintiff did in fact in several instances after January, 1930, utilize its reports.

The referee, however, is of the opinion this contention of the defendants has not been established. There were certain things which might give color to the defendants' claim, but we believe these have been fairly met by the plaintiff and the contentions of the defendants have not been sustained in that regard, and this referee so finds.

The referee finds the law touching the rights of the parties well

established by a number of decisions of the nature of this in which this plaintiff was party plaintiff. (*Dodge Co. v. Construction Information Co.*, 183 Mass. 62; 60 L. R. A. 810; *Dodge Co. v. Cary Construction Company*, U. S. Circuit Court Northern Dist. of Ohio; *Dodge Co. v. Beals & Bressan*, U. S. Dist. Court, Southern Dist. of New York; *Dodge Co. v. Great Lakes, etc., Inc.*, Illinois Circuit Court.)

The doctrine governing cases of this kind is stated in the case of *Dodge Co. v. Construction Information Co.* (183 Mass. 62), where it is said: " The important question in this case may be divided into two parts: First, Has the plaintiff any property in the information after it has been obtained at great expense and compiled for the use of its subscribers? Second, Does it lose its property by publication, abandonment, or dedication to the public, when it furnishes the information to subscribers under these contracts? The facts, before it has ascertained them, unless they are held for a special purpose confidentially and as secrets, are not property; but when these facts have been discovered promptly by effort and at expense, and have been compiled and put in form, and are of commercial value by reason of the speedy use that can be made of them before they have obtained general publicity, they are property. They represent expensive effort and valuable service, and, in the form in which they are presented to subscribers, they may be used with a reasonable expectation of profit from the early possession of them. *The information is not visible, tangible property, but there is a valuable right of property in it which the courts ought to protect, in every reasonable way against those seeking to obtain it from the owner without right, to his damage.* What the plaintiff has when the defendant seeks to obtain it from him is the possession of valuable information. This early possession is valuable in itself. The plaintiff has it and the defendant does not have it. If the defendant can obtain it legitimately he becomes the owner of the same kind of property, and the two may become competitors in the market as vendors to those who are willing to pay for it. But if the defendant surreptitiously and against the plaintiff's will takes from the plaintiff and appropriates the form of expression which is the symbol of the plaintiff's possession, and thus, by direct attack, as it were, divides the plaintiff's possession, and shares it, this conduct is a violation of the plaintiff's right of property. That there is a right of property of this kind has been decided in England in regard to information of stock quotations and other different kinds of news obtained to be furnished to those who will pay for it. *Exchange Telegraph Co. v. Gregory*, (1896) 1 Q. B. 147; *Exchange Telegraph Co. v. Central News*, (1897) 2 Ch.

48. This has also been held by different courts in this country. *Kiernan* v. *Manhattan Quotation Telegraph Co.*, 50 How. Pr. 194; *Chicago Board of Trade* v. *Christie Grain & Stock Co.*, 116 Fed. 944; *National Telegraph News Co.* v. *Western U. Telegraph Co.*, 119 Fed. 294. We are of the opinion that one's possession of information which he has obtained, compiled, and put in form for a specific use, is a right which ought to be protected against those who would share it with him without his consent."

News is a business commodity subject to ownership. So long as it is not made public, the owner has a monopoly. The distribution of secret information to many persons in confidential relationship to the owner under a contract not to divulge. it does not destroy the right. This property right in news and the service incidental to its gathering and transmission will be protected by the courts from invasion by others. (*Hunt* v. *New York Cotton Exchange*, 205 U. S. 322; *Board of Trade* v. *Christie*, 198 id. 236; *Board of Trade* v. *Tucker*, 221 Fed. 300; *Board of Trade* v. *Hadden-Krull Co.*, 109 id. 705.)

The contention of defendants that the reports of the plaintiff became public property when given to subscribers is not supported by authority. When furnished under an agreement not to divulge and in confidence, such still retain the right of protection. (*Board of Trade* v. *Christie*, 198 U. S. 236, 238, 250; *Board of Trade* v. *Tucker*, 221 Fed. 300, 305.)

In *Associated Press* v. *International News Service* (245 Fed. 244, 253), Justice WARD of the United States Circuit Court of Appeals (dissenting in parts) aid: " The distributor's knowledge of news which he has gathered is his property so long as he keeps it to himself or communicates it only to others on condition that they will do so. He will be protected against anyone who surreptitiously obtains this information from one of his members, subscribers or employees, or by any form of pilfering or unfair means. Such were the cases of *Kiernan* v. *Manhattan Co.*, 50 How. Pr. [N. Y.] 194; *Exchange Co.* v. *Gregory*, 1 Q. B. D. (1896) 147; *Exchange Co.* v. *Central Co.*, 2 Chancery (1897), 48; *Peabody* v. *Norfolk*, 98 Mass. 452; *Dodge Co.* v. *Construction Co.*, 183 Mass. 62; * * * *Board of Trade* v. *Hadden-Krull Co.*, [C. C.] 109 Fed. 705; *National News Co.* v. *W. U. T. Co.*, 119 Fed. 294; * * * *Illinois Commission* v. *Cleveland Tel. Co.*, 119 Fed. 301; * * * *Board of Trade* v. *Christie*, 198 U. S. 236; *Board of Trade* v. *Tucker*, 221 Fed. 305; * * * *Hunt* v. *Cotton Exchange*, 205 U. S. 333. * * * In every one of these cases the court found that the defendant got the news or the quotations surreptitiously, and enjoined him for that reason. They abundantly support an

injunction on the first grounds mentioned in the opinion of the Court.

"But if the distributor publishes, to use a word in this connection which I think has been unreasonably criticized, or abandons or dedicates or communicates his information to the world, his right of property in his information and his right to be protected against the use of it is gone."

The case of *Jewelers' Mercantile Agency* v. *Jewelers' Weekly Publishing Co.* (155 N. Y. 241) does not, in our judgment, sustain the defendants' contention as to publicity. The case simply holds, if a book be put within the reach of the general public so that all have access to it, no matter what limitations be put upon the use of it by individual subscribers or lessees, it is published, and what is known as the common-law copyright, or right of first publication is gone. In the present case, however, the "Dodge Reports" were never "put within the reach of the general public so it could have access to them."

The next question is whether the plaintiff, by reason of its once having used the defendants' reports, has forfeited its right to the injunction asked.

As the referee has already stated, the plaintiff discontinued the practice in January, 1930, and for nine months before the beginning of this action has not transgressed.

Under such circumstances, the referee is of the opinion that the plaintiff is not to be denied the relief asked. The general rule seems to be that if a plaintiff has ceased a conduct which might have been illegal, if discontinued at the time of the institution of the action and directly connected with the subject-matter thereof, then the court will not deny relief to which he was otherwise entitled, because prior to the institution of the action he may have committed illegal acts.

In the case of *Coca-Cola Co.* v. *Koke Co.* (254 U. S. 143) Mr. Justice HOLMES characterizes such a defense as follows: "Of course a man is not to be protected in the use of a device, the very purpose and effect of which is to swindle the public. But the defects of a plaintiff do not offer a very broad ground for allowing another to swindle him. The defense relied on here should be scrutinized with a critical eye."

In *American Lead Pencil Co.* v. *Gottlieb & Sons* (181 Fed. 178, 181 [1910], Circuit Court, Southern Division of New York) Judge HAND has phrased his view as follows: "The defendant's unctuous regard for the good faith of the man whose business he is pirating in this case only suits some better world than this."

In *Coca-Cola Co.* v. *Koke Co.* (*supra*) the United States Supreme

Court placed its stamp of approval upon this doctrine. In the opinion Mr. Justice HOLMES (at p. 147) makes it very clear that the plaintiff must be judged by his conduct at the time he came seeking relief. His words are these: " The plaintiff's position must be judged by the facts as they were when the suit was begun, not by the facts of a different condition and an earlier time."

On numerous occasions the same question has been presented to the courts. The result has been the same.

*American Agricultural Chemical Co.* v. *Moore* (17 F. [2d] 196, 199, Dist. Court, Northern Div., Ala.): " Suffice it to say that the rights of the parties are to be adjudicated by the facts as they existed at the time of the filing of the bill, and not by what may or may not have occurred at some remote period."

*Moxie Nerve Food Co.* v. *Modox* ([1907], 153 Fed. 487, 489; affd., 162 id. 649, Cir. Ct. R. I.): " The defense of unclean hands, to avail must be based upon conditions existing at the time when the party applies for equitable relief. A period of more than 15 months has elapsed since the discontinuance by the complainant of the use of the labels which were found to contain misrepresentations."

*Vortex Mfg. Co.* v. *Ply-Rite Contracting Co.* ([1929] 33 F. [2d] 302, 313, Dist. Court. Md.): " *Furthermore, all of such statements appear to have been made prior to the filing of the present suit. In the absence of unusual circumstances, misrepresentations that have been discontinued before commencement of a suit cannot be availed of as a defense.* That is, the defense of unclean hands, to prevail, must usually be based upon conditions existing at the time when equitable relief is sought." The same court reiterated its holding in *Anheuser-Bush, Inc.*, v. *Cohen* ([1930], 37 F. [2d] 393).

*American Thermos Bottle Co.* v. *Grant Co.* ([1922] 279 Fed. 151, 159, Dist. Ct. Mass.; affd., 282 id. 426 [C. C. A. 15]): " Finally, plaintiff contends that, even if held in the wrong in this case, it should have an opportunity to purge itself and then assert rights in its trade-mark. I accept that view. I do not understand that the doctrine of unpardonable sin applies to such plaintiffs. Indeed, I cannot believe this court, by now holding the plaintiff disentitled by reason of its own misconduct to equitable help, can bind any other court in which the plaintiff may hereafter seek relief from unfair competition in the use of its trade-mark, assuming that it has or shall have a valid trade-mark. ' The law of trade-marks is but a part of the broader law of unfair competition,' as Mr. Justice PITNEY says in *United Drug Co.* v. *Rectanus Co.*, 248 U. S. 90, 97, 39 Sup. Ct. 48, 50 (63 L. Ed. 141). In such case ' the plaintiff's position must be judged by the facts as they were when the suit was begun, not by the facts of a different condition and

an earlier time ' by Mr. Justice HOLMES in Coca-Cola Co. v. Koke Co., 254 U. S. 143, 147; 41 Sup. Ct. 113, 114 (65 L. Ed. 189); Diamond Crystal Salt Co. v. Worcester Salt Co., 221 Fed. 66; 137 C. C. A. 16; Coca-Cola Co. v. Old Dominion Beverage Corp. (C. C. A.) 271 Fed. 600; Moxie Co. v. Modox Co., et al. (C. C.) 153 Fed. 487; Gaines & Co. v. Turner-Looker Co., 204 Fed. 553; 123 C. C. A. 79; Lambert Pharmacal Co. v. Bolton Chemical Corp. (D. C.) 212 Fed. 325."

In Fox Co. v. Best Baking Co. (209 Mass. 251, at p. 259) the opinion of the court states: " The question we have to decide is whether the plaintiff who, for nearly a year and a half before the bill was filed, stopped all advertisements which were not true, is to be precluded from having the defendants enjoined from selling their bread as the plaintiff's bread because some of its former advertisements contained statements which were not true. In our opinion that would be going too far, and the only authorities we have seen are to that effect." (See, also, Federal Trade Com. v. American Snuff Co., 38 F. [2d] 547 [C. C. A. Third Circuit]; Pillsbury v. Pillsbury-Washburn Flour Mills Co., [1894] 64 Fed. 841 [C. C. A. Seventh Circuit]; Carpenters' Union v. Citizens' Committee, [1927] 244 Ill. App. 540; De Forest Radio v. Radio Corp. of America, [1926], 132 Atl. 496 [N. J.].)

In all of the above cases the cleansing process took place at various periods prior to the commencement of the action. The principle enunciated, however, is the same in every case. The question of the exact time does not seem material.

The referee reaches the conclusion the plaintiff is entitled to the injunction asked.

We are of the opinion, however, this should be without costs to either party:

We reach this conclusion for the reason that up to January, 1930, the plaintiff did to a degree acts similar to those it now seeks to restrain the defendants from doing. The defendants pursued the same practice although not justified in so doing. It, however, does not appear the plaintiff ever advised the defendants it on its part had ceased invading the defendants' rights.

All things considered, we have concluded to deny costs to the successful party.

Let findings be drawn according to the above views.