The AMERICAN THERMOS PRODUCTS COMPANY, Plaintiff,

v.

ALADDIN INDUSTRIES, INCORPORATED, Defendant.

No. 7320.

United States District Court
D. Connecticut.

June 26, 1962.

Wallace H. Martin, Walter J. Halliday and Robert Bonynge, Nims, Martin, Halliday, Whitman & Williamson, New York City, Shepherd, Murtha & Merritt, Hartford, Conn., for plaintiff.

Dugald S. McDougall, Theodore R. Scott, Ooms, McDougall & Hersh, Chicago, Ill., Curtiss K. Thompson, Thompson Weir & Barclay, New Haven, Conn., for defendant.

ANDERSON, Chief Judge.

1. This is an action for threatened trade-mark infringement. The plaintiff is a Michigan corporation, having its principal place of business at Norwich, Connecticut. The defendant, an Illinois corporation, has its principal place of business at Nashville, Tennessee. While both parties make and sell some other products, they are competitors in the manufacture and sale of vacuum-insulated containers of the type used to keep beverages and foods hot or cold. The case arises under the Trademark Act of July 5, 1946, as amended, U.S.C.A. Title 15, § 1051 et seq.[1]; there is also diversity of citizenship of the parties.

2. This action was filed on June 10, 1958. The complaint alleged that the plaintiff owned eight U. S. trade-mark registrations covering the word "Thermos" and charged the defendant with threatening to sell its own goods under the name "thermos", in alleged violation of plaintiff's trade-mark rights. (The complaint also charged the defendant with having actually sold goods thus marked, but no such sales have ever in fact been made.)

3. In its answer the defendant acknowledged the existence of a justiciable controversy between the parties, acknowledged its intention to sell vacuum-insulated containers as "thermos bottles", and averred that the term "thermos" or "thermos bottle" is a generic word or phrase in the English language. Thus the issue defined by the pleadings is whether the word "thermos" is, in fact, a generic descriptive term for a vacuum-insulated container or, on the other hand, is a trade-mark uniquely identifying a product made and sold by the plaintiff.

4. The plaintiff's original predecessor in the United States was a German company known as "Thermos-Gesellschaft M. B. H.", which dealt in vacuum-insulated containers. The German company's business in the United States was taken over in 1907 by a newly organized Maine corporation named "The American Thermos Bottle Company"; it acquired U. S. patent rights from the German company and set up a factory in Brooklyn, New York. A program of advertising and promotion was launched by the new company, and it prospered. As business grew, the headquarters was moved to Norwich, Connecticut.

5. In 1925, the business and assets of the Maine corporation were, through mesne conveyances, taken over by an Ohio corporation, also named "The American Thermos Bottle Company". In 1925, the Ohio company acquired a competitor, Icy Hot Bottle Company and in 1929 pur-

---

1. "§ 1114. *Remedies; infringement; innocent infringement by printers and publishers*

 (1) Any person who shall, in commerce, (a) use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services; * * * shall be liable to a civil action by the registrant for any or all of the remedies hereinafter provided in this chapter * * *."

chased another competitor, The Keapsit Company. In 1956 the corporate name of the Ohio Company was changed to The American Thermos Products Company, and business has continued under that name since then. On a few of its products, however, the plaintiff is still using the old name "The American Thermos Bottle Company".

6. The Ohio corporation was the original plaintiff in this action. In November of 1960, however, its business and assets were transferred to a Michigan corporation of the same name, which is now the party plaintiff. For convenience, the term "plaintiff" will be used throughout the remainder of these findings to designate the present party plaintiff and its various predecessors, the particular corporation or corporations referred to in each instance being indicated by the context.

7. Vacuum ware, with which this suit is concerned, consists of double-walled glass vessels with a vacuum between the walls. Such vessels or containers are provided with protective metal or plastic casings and other improvements, including shock absorbers and various designs of closures. It is an adaptation of the vacuum flask perfected by Dewar about 1893, but not patented.

8. The defendant began to manufacture and sell substantial quantities of vacuum ware in 1945. Although in the years 1945 through 1960 sales by the plaintiff and by the defendant were in a few instances slightly less than those of the next preceding year, the general trend of their net sales was upward.

9. The net sales of vacuum ware of the plaintiff in 1907 were $114,987; in 1910, $381,184; in 1923, $1,405,677; and in 1936, $2,536,112. Its net sales in 1945 were $5,315,053 and in 1960 were $13,-280,164. The net sales of vacuum ware by the defendant in 1945 totaled $560,128 and in 1960 were $6,805,283.

10. Since 1957 the plaintiff's net sales of its "Thermos" trade-mark products have exceeded $225,000,000; they have been extensively advertised both by the plaintiff, at a cost in excess of $9,000,000, and by plaintiff's customers under the trade-mark "Thermos" throughout the United States.

11. The plaintiff is the owner of the following registrations of its trademark "Thermos" in the United States Patent Office:

| Registration No. | Registration Date | Trademark |
|---|---|---|
| 67,002 (renewed) | January 7, 1908 | "Thermos" |
| 176,064 (renewed) | November 13, 1923 | "THERMOS" |
| 229,816 (renewed) | July 5, 1927 | "THERMOS" |
| 700,748 | July 12, 1960 | "THERMOS" |
| 724,440 | November 28, 1961 | "THERMOS" |
| 725,313 | December 19, 1961 | "THERMOS" |
| 725,447 | December 19, 1961 | "THERMOS" |
| 729,146 | March 27, 1962 | "THERMOS" |

12. From about 1893 to the present time vacuum-insulated vessels and containers have been called by the descriptive names of "vacuum bottle", "vacuum flask", and "vacuum vessel" and from 1908 to the present time all of plaintiff's competitors in describing or referring to their vacuum-insulated products have used the terms "vacuum bottle", "vacuum jug", etc.

13. The plaintiff's predecessor, Thermos-Gesellschaft M. B. H., in March of

1904 began calling its products of double-walled glass vessels with a vacuum between the walls, "Thermos" products.

14. On March 20, 1907 Thermos-Gesellschaft M. B. H. applied to the patent office for registration of "Thermos" as a trade-mark. It became registered as a trade-mark January 7, 1908.

15. Between 1907 and 1923 the plaintiff used the word "Thermos" almost exclusively in referring to its vacuum-insulated products. Its advertising and literature during those years referred to its product as "Thermos bottle" without reference to or connection with any then used generic term as, for example, "Thermos vacuum bottle" or "vacuum bottle by Thermos".

16. Although the plaintiff, during this period, in most instances accompanied the use of the stylized form of the word " *THERMOS* " with a notation in relatively small letters that it was a trade-mark, it used "Thermos", as a noun or adjective, as the sole designation and description of its vacuum-insulated containers.

17. As early as 1910 plaintiff asserted "that Thermos had become a household word."

18. In the latter part of this period the plaintiff included a page in its catalogue which pointed up the stylized " *THERMOS* " as a registered trade-mark followed by some discourse about the qualities of the products, including the sentence:

"By adhering to these principles since the inception of this industry, linked with our extensive educational publicity campaigns, confidence has been established in the minds of the public that Thermos, the original temperature retaining vessels in the various designs, has become a necessary commodity and a boon to humanity."

In most instances the descriptive material in the catalogue shows the use of "Thermos" as a synonym for "vacuum-insulated".

19. The word "Thermos", used as a synonym for "vacuum insulated", was, in the latter part of this period, used by the unorganized public in reading-notices, editorials, and other writings for publication. The plaintiff recognized this as an "enormous amount of free advertising" worth, at that time, between three and four million dollars based upon what the plaintiff would have had to pay for it.

20. As a result of plaintiff's plainly generic uses of the word as a name for its product and its uses of "Thermos" as a synonym for "vacuum-insulated", with the complete absence of the use of "Thermos" followed by the words "vacuum bottle", "vacuum jug", or "vacuum carafe", etc., or any other generic term, disseminated through the plaintiff's "extensive educational publicity campaigns", "thermos", as a descriptive word, came into popular use.

21. On February 25, 1922 in American Thermos Bottle Co. v. W. T. Grant Co., 279 F. 151, aff'd 282 F. 426, the United States District Court for the District of Massachusetts said:

"Belatedly defendant's counsel suggests that 'Thermos' is a descriptive word, and that the trade-mark is therefore not valid. This issue was not pleaded, if it needs to be. When the stipulation was made, the parties probably intended by implication to cover the validity as well as the ownership of the trade-mark. The question is not absolutely free from doubt. The vacuum bottles are vessels excluding and including heat, and in that aspect 'Thermos' is descriptive. There is no evidence in the record that Thermos means to the public vacuum bottles produced by the plaintiff. Compare Coca-Cola Co. v. Koke Co., 254 U.S. 143, 146, 41 Sup.Ct. 113, 65 L.Ed. 189. For present purposes I assume without deciding that the plaintiff has a valid trade-mark." 279 F. at 152.

22. While this portion of the District Court's decision was expressly not an adjudication of trade-mark invalidity for

genericness, it was a hint or suggestion that such an assertion, if made in time, might have been sustained.

23. Immediately following the decision, the plaintiff began to use, in its advertising and on its products, besides the word "Thermos", the words "vacuum bottle" or "vacuum jug", etc., as well as using its trade-mark versions of "Thermos", accompanied by notations of their trade-mark registration.

24. In spite of the addition of the generic terms, "vacuum bottle", "vacuum jug", etc., with the trade-mark in prominent print and in a conspicuous location in its catalogues and advertising, the plaintiff continued to use the word "Thermos" in the text of its catalogues and in the description of its products unaccompanied by any indication that it was a trade-mark and without the generic terms.

25. During the period from 1923 to 1953 jobbers, distributors and retailers and others in the trade recognized and treated "Thermos" as a trade-mark.

26. There were, however, in trade journals, in advertising and in publication releases by persons identified with the trade, a number of uses of "thermos" as a descriptive term. From 1935 to the time of trial the plaintiff employed a clipping bureau to search out descriptive uses of "thermos" in advertising and in the trade.

27. The plaintiff notified such advertisers or members of the trade of the trade-mark significance of "Thermos" and requested them to discontinue the descriptive use of the word. This request was in nearly all instances complied with.

28. It is agreed by the defendant that the word "Thermos" is recognized and treated as a trade-mark in the trade.

29. During the period 1923 to about 1953 the plaintiff made no investigation or attempt to seek out editorial or literary uses of "thermos" as a generic term. There were many hundreds of such uses in dictionaries, treatises, magazines, newspapers and books which were readily discoverable. The plaintiff protested only those few which came to its attention.

30. During this period of approximately thirty years the plaintiff wrote less than two or three dozen protest letters with regard to such non-trade generic uses of "thermos". Nor was the paucity of protests compensated for by any other program to stem the rising tide of such uses. While certain items of educational material accompanied letters of protest, there was no formalized educational program aimed at dissuading the general public from using the word generically. In fact, in its trade literature and advertising it continued to put its major emphasis on the word *"THERMOS"* compared to the generic words with which it was associated, such as "vacuum bottle", by using larger, bolder and more striking letters in the word *"THERMOS"*. Thus, its advertising and labeling was not a significant force in reeducating the consumer public.

31. Through these years the plaintiff was concerned lest the rapidly growing generic use of "thermos" cause it to fall into the public domain; but, at the same time, it was reluctant to object to non-trade generic uses of the word for fear of creating ill-will and for fear of losing the economic advantage which accrued to it through the widespread free advertising which resulted from such use.

32. The plaintiff failed to use reasonable diligence to prevent "Thermos" from being or becoming a descriptive or generic term and by 1953 the generic or descriptive use of "thermos" had become established in American usage.

33. Between 1954 and 1957 the plaintiff, aware of the widespread generic use of "thermos", changed its name from The American Thermos Bottle Company to The American Thermos Products Company and planned, and ultimately put into effect, a diversification of products, not vacuum-insulated, but bearing the "Thermos" trade-mark for the purpose of accentuating the use of the word as a trade-mark on products which were

14

neither vacuum-insulated nor accessories to vacuum-insulated products.

34. Between 1958 and 1962 the plaintiff commenced the manufacture and sale of tents, firelighters, camp stoves, lanterns, swivel-seat shell boxes, bottle openers and cap catchers, all bearing the "Thermos" trade-mark.

35. Prior thereto other products manufactured and sold by the plaintiff between 1907 and 1962, which bore the "Thermos" trade-mark, were accessories to or used in connection with vacuum-insulated or insulated ware, such as lunch kits, lunch boxes, pails and kits, and trays and cups.

36. In 1957 the plaintiff intensified its policing activities both with regard to generic uses of "thermos" in the trade and those in editorial and literary writings which appeared in non-trade publications.

37. In 1959 it extended the hired clipping bureau service to include editorial and literary generic uses of "thermos" in non-trade publications.

38. The additional efforts made to reverse the trend of generic use and to retrieve the word "thermos" from the public domain were not effective.

39. There is among the consumer public an appreciable minority which knows and recognizes "Thermos" as a trademark and uses it in making its purchases.

40. Because of the widespread generic use of the word "thermos", potential purchasers of vacuum-insulated bottles more often ask for a "thermos" than for a "vacuum bottle". Most of such requests are treated by the retail trade as orders for vacuum-insulated bottles manufactured by the plaintiff; because the trade uses "Thermos" solely as a trade-mark.

41. The word "thermos" is almost universally *understood* by the American public as a descriptive word for vacuum-insulated containers whenever members of the public see or hear it so used, regardless of whether such members, themselves, so use the word, or use it in its trade-mark significance or use some other

generic term to describe this particular kind of product.

*Conclusions of Law:*

1. The court has jurisdiction of the subject matter and of the parties in this action.

2. The defendant has sustained its burden of proof in rebutting the presumption of the validity of the plaintiff's trade-mark "Thermos" which arises from its registration as a trade-mark with the United States Patent Office insofar as it is presumed not to be a descriptive or generic term; and the defendant has sustained its burden of proof that the word "thermos" is descriptive and generic and belongs in the public domain.

3. The word "thermos" has become a generic descriptive word in the English language as used in the United States.

4. The word "thermos" became a part of the public domain because of the plaintiff's wide dissemination of the word "thermos" used as a synonym for "vacuum-insulated" and as an adjectival-noun, "thermos", through its educational and advertising campaigns and because of the plaintiff's lack of reasonable diligence in asserting and protecting its trade-mark rights in the word "Thermos" among the members of the unorganized public, exclusive of those in the trade, from 1907 to the date of this action.

5. As the word "thermos" was derived from the plaintiff's trade-mark "Thermos" there is an appreciable, though minority, segment of the consumer public which knows, recognizes and uses the plaintiff's trade-mark "Thermos" and, therefore, to eliminate confusion and the possibility of deceit of such consumers, the use by the defendant, as a member of the general public, of the word "thermos" in its literature, in its advertising and on its labels is subject to the following restrictions and limitations:

(a) the defendant will precede each of its uses of the word "thermos" by the possessive of the name "Aladdin" or, at

its option, the possessive of "Aladdin" plus one of defendant's brand names.

(b) all defendant's uses of the word "thermos" will be entirely in lower case letters.

(c) paragraph (b) will be construed to prohibit the use of an initial capital "T".

(d) in its uses of the word "thermos" the size and style of the type of each letter of the word must be the same as those of the other six letters.

(e) the defendant will make no use of the word "thermos" in which the letters of the word are in any respect larger in size than:

(1) any of the letters of other names or words with which the word "thermos" is used; and

(2) any of the letters of the same phrase, clause or sentence in which it is used.

(f) the defendant is prohibited from using in its labeling, advertising or publication releases the words "genuine" or "original" or any other words or phrases synonymous therewith, relating to or referring to the word "thermos". (It should also be understood in connection with these limitations that defendant's use of "thermos" must invariably be preceded by "Aladdin's".)

(g) the defendant must, in filling any orders which it might receive in which the buyer uses the word "thermos" unmodified by "Aladdin's" or "your" or other reference to or designation of the defendant, include a notice to the buyer that the order is being filled by "Aladdin's" thermos, followed by the defendant's number of the product or part.

6. The defendant will be enjoined and restrained from using "thermos" except in the manner set forth in ¶5 above.

[3] 7. The plaintiff's trade-marks #67,002, #176,064, #229,816, #700,748 #724,440, #725,313, #725,447 and #729,146 are declared to be valid except that they are not infringed and will not be infringed by the defendant's generic descriptive use of the word "thermos"

in lower case type, used in accordance with the provisions of ¶5 above.

## DISCUSSION

. This case is concerned with the question whether or not the word "thermos" has become established in the English language, as used in the United States, as a generic, descriptive term, synonomous with "vacuum-insulated" and thus employed as an adjective, for example, "thermos bottle", "thermos jug", etc., or as an adjectival-noun, "a thermos".

The history of the use of the word "thermos" and the part played in it by the plaintiff fall into three fairly distinct periods: first, from 1907 to 1923; second, from 1923 to the early 1950's and third, from that time to the present.

*First Period: 1907–1923*

At the beginning of the first period the plaintiff took the word "thermos" from the name of its German predecessor, "Thermos-Gesellschaft M.B.H.", and incorporated it into its own name "The American Thermos Bottle Company".

"Thermos" is not taken directly from the English language nor is it a completely fanciful word but something in between: "a coined word with a penumbra of suggestion"[2]; it is directly taken from the classical Greek word for "hot" and, as a root for the familiar English prefixes "thermo" and the like, it suggests something to do with temperature.

Although at that time several competitors and others who had occasion to refer to this kind of container, used the generic terms "vacuum-insulated vessel", "vacuum jacketed bottle" and "vacuum bottle", the plaintiff sought constantly and assiduously through its educational program to popularize "Thermos bottle" as the name of that product and as an adjective with the name of other products which were vacuum insulated, without including any of the generic terms then used, as, for example, "Thermos vacuum-insulated bottle" or "Thermos vacuum jacketed bottle" or "Thermos vacuum

2. Lambert Pharmacal Co. v. Bolton Chem. Corp., 219 F. 325, 327 (S.D.N.Y.1915).

bottle." The plaintiff protests that its use of "thermos", as an adjective or standing by itself as a noun, was never intended by it to be anything more than an effort to spread the use of the name as a trade-mark with the initial "T" always capitalized and that when it said, for example, in its 1910 catalogue "that Thermos is a household word", "Thermos" was used only in a proprietary sense. But a reading of the whole paragraph from page 5 of the 1910 catalogue shows, intentionally or not, an encouragement for generic use as a synonym for "vacuum insulated":

> "TODAY we are housed in the twelve-story fireproof Thermos Building located in the heart of Manhattan; 243-5-7 West 17th Street, through to 232-4 West 18th Street;

> "That Thermos is a household word and the Thermos product is known, used and appreciated throughout the civilized world;

> "That Thermos is sold and recommended by every good store everywhere;

> "That Thermos has become indispensable in the nursery and in the sick room and for other household purposes;

> "That Thermos has become alike indispensable to the sportsman, workman, yachtsman, automobilist, aeronaut, explorer, student—in a word, everybody needs Thermos

> "Please bear in mind: Thermos is a GLASS PRODUCT, but will last a lifetime if handled with care—as a glass product."

The oral use of "Thermos" by members of a household did not, in all likelihood specify that it was being used with a capital "T" and as a trade-mark. Such use, with the descriptive words "vacuum insulated" left out, produced what the plaintiff describes as a "careless" use of the trade-mark but which quite readily turned into a generic use of "thermos". The plaintiff was not unaware of this "careless" use and, except for dealers in the trade, approved such use in publications and among the general public as media of very advantageous free advertising, which it told its dealers in 1917 was worth to the plaintiff, at then current rates, three to four million dollars.

The plaintiff claims that during this period, from 1910 onward it stamped its products with the word "Thermos", followed by the words "registered trade-mark" and in the later years of the period designated the word "Thermos" as a registered trade-mark in its catalogues; but this was, in nearly all instances, by a use of the stylized word " 𝕿𝖍𝖊𝖗𝖒𝖔𝖘 " with "Reg. Tr. Mk." under it, while the text of writings and catalogues used the word "thermos" over and over, in the same size and style of type as the words surrounding it, and without reference to its being a registered trade-mark.

As a result of plaintiff's use of the word "thermos" as a synonym for "vacuum insulated" and as a word designating its product without accompanying words such as "vacuum jacketed" or "vacuum insulated", and in consequence of plaintiff's educational program and the public's preference for the word "thermos" as a relatively less cumbersome name for a vacuum-insulated container or vessel, "Thermos" had, by the end of the first period, i. e. by 1923, acquired firm roots as a descriptive or generic word.

The course of conduct of the plaintiff from 1907 to 1923 in its advertising and educational campaigns tended to make "thermos" a generic term descriptive of the product rather than of its origin.

*Second Period: 1923-1953*

The second period, commencing about 1923, followed the decision of the United States District Court in American Thermos Bottle Co. v. W. T. Grant Co., 279 F. 151 (Mass.1922), aff'd 282 F. 426 (1st Cir.1922), in which the court suggested that "Thermos" might at that time be a descriptive word and therefore invalid as a trade-mark; but it dismissed, as not raised in time, a defense based on

this claim. Immediately thereafter, in its advertising and labeling, the plaintiff adopted the use of the word "vacuum" or the words "vacuum bottle" with the word "Thermos", although sometimes it used the words "Thermos bottle" with the term "vacuum bottle" separated from it and in relatively inconspicuous print. It, for the first time, made use of the words "vacuum bottle", "vacuum jug", etc., by adding them to "Thermos" in its catalogues and advertisements, displaying them with a fair degree of prominence, with some exceptions; but it usually omitted these descriptive words in the text.

In general, jobbers, retailers and others in the trade recognized and used "Thermos" as a trade-mark and the plaintiff, with but few exceptions which it did not pursue, was able to prevent a generic use in the trade by a simple reminder to the offender that "Thermos" was a trade-mark. There is no issue in this case as to the use of the word "Thermos" in the trade.

The plaintiff did not, however, during this period take affirmative action to seek out generic uses by non-trade publications and only protested those which happened to come to its attention. For the most part such publications or writers, after receiving a protest letter from the plaintiff, agreed to discontinue their generic use of the word. If they refused, the plaintiff did not do anything further about it. The plaintiff particularly protested the generic use in dictionary definitions and many complied; but an even greater number were not sought out and protested. The great majority of dictionaries showed both trade-mark and generic uses. However, the fact that the word was being included in most dictionaries and the fact that the generic definition was occurring more and more often, evidenced the widespread growth of "thermos" as a synonym for "vacuum-insulated" in common usage [3] particularly in connection with bottle, jug, jar and flask.

The number of protests by the plaintiff of editorial and literary generic use by the general public during this thirty year period was infinitesimal compared to the large numbers of generic uses of "thermos" in newspapers, magazines, both popular and scientific, treatises and text-books, works of fiction and non-fiction and in encyclopedias and dictionaries.

During this period the generic use of "thermos", which had taken firm root during the first period, had grown to a marked extent in non-trade publications, and by the early 1950's reflected a widespread use by the unorganized public of "thermos" as a synonym for "vacuum-insulated" and, also, standing alone, as a noun meaning a vacuum jacketed or insulated bottle.

The evidence discloses less than two or three dozen protest letters sent to claimed editorial and literary (i. e. non-trade) misusers for the thirty years between 1923 and 1953. It is therefore found that the plaintiff failed to use reasonable diligence to rescue "Thermos" from being or becoming a descriptive or generic term.[4]

3. In a memorandum dated November 16, 1940 from Mr. A. E. Payson, the plaintiff's President, to Mr. I. K. Fearn, Vice President in Charge of Sales, concerning the treatment of "Thermos" in dictionaries, Mr. Payson said:

"I am asking Pennie, Davis, Marvin & Edmonds, in view of their opinion in this matter, to write up a dictionary definition for THERMOS in the hope that we will be able to get it included in as near the proper form as possible. As a matter of fact, according to their reasoning, THERMOS ought not be in the dictionary as all. The very fact that it is in the dictionary means that it is a word of such common use that it requires definition, and this undoubtedly would be cited against us in a law suit to defend the trade-mark. The best we can do is to try to 'purify' the definition of the word, and with that in view I will try and get hold of a desired definition."

4. Toward the end of this thirty year period some of the plaintiff's officers were becoming increasingly aware of the risk to the trade-mark "Thermos" in the great growth of the generic use of the term. In a letter dated July 23, 1946 from the

During this second period the plaintiff appears to have been torn between fear, on the one hand, that its trade-mark rights in "thermos" would, as the U. S. District Court in Massachusetts hinted, be lost for genericness and a reluctance, on the other hand, to surrender or impair the economic advantages which were continuing to accrue to it from the use of "thermos" as a household word to describe the product—a use which had taken such firm root in the years 1907–1923. Its solution was to give in its catalogues and advertisements new recognition and some emphasis to the descriptive terms "vacuum" or "vacuum insulated"; to search out generic uses in the trade and seek the voluntary discontinuance of such uses; and, in cases of generic uses by the public only to protest when such uses happened to come to its attention, which appear to have been relatively few compared to the numbers of such uses shown in evidence.

The plaintiff's policy during this period when such a question came up, to the extent that conflicts of ideas within management permitted,[5] was not to press the issue to a conclusion lest it be found by a court that "Thermos" had already become a descriptive term.[6]

plaintiff's Vice President in Charge of Sales to Mr. W. M. Hutchison, of Keeling & Company, Indianapolis, Indiana, the following statements appear:

"Today at the weekly staff meeting, I brought up the question of misuse of our trade-mark. That is very much on the increase today, principally because the mention of vacuum insulated goods and their uses is very widely increased. We had considerable discussion of the point and from that arrived at the decision to do something about it.

"Mr. Payson will recheck the matter with our legal counsel so as to get his opinion on whether our present course of merely writing letters of protest is sufficient to cover the legal requirements of the matter. In addition to that, he has asked me to consult with you on possible suggestions for amplifying and improving our activity in this matter.

" * * * Further, back in 1937, either you or we did write to a number of dictionary and encyclopedia publishers and publishers of school textbooks and point out the correct usage of the trade-mark "Thermos".

"It is some such activity as that, that seems to us now to be advisable. Among other suggestions that came into the meeting were that all advertising agencies and all publications, particularly those magazines which go to the general public as well as to the trade, should be put on notice as to the position of the registered trade-mark "Thermos".

" * * * we can continue our letters of protest on any infractions of the trade-mark and intensify those. I suspect that all of us have rather let that activity drop out during the wartime, since we probably felt that to raise the question of the trade-mark when we were not supplying enough goods would simply create ill-will.

\* \* \* \* \* \* \*

" * * * The real difficulty, of course, has been in getting agreement to do something about it. I think we have that now and, therefore, can go ahead."

In spite of this, however, little was done by the plaintiff between 1946 and 1953 with regard to non-trade generic uses of "Thermos". It sent no more than a dozen of such protest letters to dictionaries and publications having general public circulation. Of these about a half dozen agreed to comply with the plaintiff's request; the others either ignored the protest or expressly refused to comply.

5. Footnote 4, ante.

6. In a letter from Mr. A. H. Payson, Vice President of The American Thermos Bottle Company, dated January 8, 1952 in response to inquiry by F. S. Slyder, a field representative of the Company, concerning an instance of descriptive use of the word "Thermos" in the trade, Mr. Payson wrote as follows:

"We have had numerous instances of having protested the misuse of 'Thermos'; however, a short time later another violation pops up. The only real answer, of course, is suit, the winning of a judgment and the broadcasting of the result to all of our customers.

"Action has been contemplated; however, management here as well as our attorneys is very loathe to go to law to enforce our trademark rights. There is a very real danger that some 'liberal' might decide, particularly, if he himself has been in the habit of using 'Thermos' as a generic term, to declare it that. Damage of an adverse decision would

*Third Period: 1953–1962*

The third period covers the years from about 1954 to the time of the trial February to April, 1962. Between 1954 and 1957 the plaintiff's activities showed awareness of widespread generic use of "thermos" and of the necessity of doing much more than had been done prior to 1954 to stop such use and educate the public to the word's trade-mark significance. It planned, and ultimately put into effect, a diversification of products, not vacuum insulated and not directly related to containers designed to keep their contents hot or cold. Theretofore plaintiff's products other than insulated containers had almost entirely been accessories to such containers. The new plan brought about the manufacture of tents, fire-lighters, camp stoves, lanterns, swivel-seat shell boxes, bottle openers and cap catchers, all labeled as "Thermos" brand.

The plaintiff changed its name from the American Thermos Bottle Company to The American Thermos Products Company. In 1957 the plaintiff began to intensify its policing activities both of generic uses of "thermos" in the trade and in editorial and literary generic uses in non-trade publications.[7]

In 1935 the plaintiff had subscribed to a clipping bureau which furnished it with claimed misuses of the trade-mark "Thermos" which appeared in paid advertisements and this service was continued up to the time of trial. From 1935 through 1958 it had no such service to detect and report the claimed misuses of the trade-mark "Thermos" in non-trade publications and by the unorganized public. However, on January 1, 1959, the clipping service was extended to include editorial and literary descriptive uses of "Thermos".

Before the inauguration of these new measures, however, the generic use of "thermos" had become firmly impressed as a part of the everyday language of the American public. The plaintiff's extraordinary efforts commencing in the middle of the 1950's and carried on into the time of the trial came too late to keep the word "thermos" from falling into the public domain; rather it was an effort to pull it back from the public domain— something it could not and did not accomplish.

*Comments on Portions of the Evidence*

Much of the evidence in the case consists of many hundreds of clippings from publications showing different uses of "thermos" in various forms. The diverse nature of the evidence and the claims made with respect to it vary with the divergent claims of law which the parties make. The plaintiff has submitted hundreds of clippings showing the use of "thermos" in its different trade-mark forms and uses of other generic terms such as "vacuum jacketed", "vacuum insulated", "vacuum container"; however, except for a very small fraction, these were uses made in the course of advertising or articles written by or for the trade which, the defendant concedes, recognized and used "Thermos" as the plaintiff's trade-mark and also used vacuum jacketed, vacuum insulated, etc., as generic terms. The few instances shown by the plaintiff's exhibits to have been editorial or literary uses were in part the result of publication releases by the plaintiff, itself. The plaintiff has also asserted with respect to both large portions of its own evidence, including use of "thermos" by dictionaries, by encyclopedias, and by the Connecticut residents which it summoned to court to testify that their use of "thermos" in replying to the defendant's Sindlinger poll were made with an awareness that "thermos" was a trade-mark, and other similar instances were what the plaintiff called "careless" uses of the trade-mark and cannot be counted as generic. This

be irreparable as you know. I question very much if were the decision left up to you that you would decide to go to law."

7. For the year 1957 et seq. the plaintiff wrote the following numbers of letters of protest: 1957—178; 1958—270; 1959—1109; 1960—950; and 1961—1171.

assertion by the plaintiff does bear analysis because, regardless of whether or not a person knows that "thermos" is a trade-mark, if he uses the trade-mark word as the name of the product, it is used in a descriptive sense and is therefore generic. The plaintiff may more logically argue that a person, admitting that he knows that "Thermos" is a trade-mark, thus gives recognition to the existence of the trade-mark use. The great majority of dictionaries show the word "thermos" both as a synonym for vacuum insulated or as a noun standing for a product so described, and also state that it is a trade-mark. The plaintiff, of course, may rightfully claim that the mention of the trade-mark use is a recognition of the existence of the trade-mark; but it is equally proper for the defendant to assert that it also presents the word as one generically used.

Hundreds of clippings or excerpts from publications show literally thousands of literary and editorial uses of "thermos" as a descriptive or generic word and reflect the widespread use and understanding of "thermos" as a generic term. The material from the files of both companies, particularly the policing files of the plaintiff and the customer correspondence from the defendant's files, tend to show the growth of the generic use of "thermos" and its widespread acceptance by the public. Portions of the defendant's consumer correspondence constitute the only substantial showing of consumer use of "vacuum bottle" or other "vacuum" container as the descriptive term. The weight of this is considerably impaired by the implication, which the majority of such pieces of correspondence carry with them, that these were not instances of ordinary everyday use, but were specific orders for particular numbered products which the consumer was ordering with either the defendant's catalogue or other descriptive advertising, or the product itself, immediately before him. It is somewhat revealing that in spite of these circumstances about one-third of the customers referred to the products through the descriptive word "thermos".

The testimony of the defendant's expert, Dr. Kemp Malone, a distinguished philologist, was logical and persuasive. His explanation for the acceptance by the public of "thermos" as a generic term and its rapid growth as a name for the product was that it was in part attributable to a characteristic of the general public, and a familiar phenomenon in linguistics, that people tend to adopt and use the shortest and simplest word which will adequately communicate the idea or call to mind the object or product that they want to tell about.

There is sufficient evidence in the case, exclusive of the opinion polls taken by each of the parties, to show that "thermos" has become and is now a generic term in the English language as used in the United States. The polls tend to corroborate what the court has found to be demonstrated by the other evidence in the case. The method of poll taking adopted by each of the parties reflects their respective views of the law and each method was designed to elicit the kind of evidence each wished to bring out. For example, as will be more fully discussed below, the plaintiff asserts that if it can show the recognition and the trade-mark use of the word "Thermos" by a substantial minority of consumers and that it has made a reasonable effort to police the trade-mark, there can be no valid generic use of the trade-mark as a word. The plaintiff, therefore, asked 3,650 members of the public the following question:

"Please name any trade-mark or brand names, with which you are familiar, for vacuum bottles, insulated bottles or other containers, which keep the contents hot or cold."

This obviously focused the mind of the interviewee upon trade-marks or brand names and on the basis of this emphasis on the question, the plaintiff assumed and argued that all responses whether written with a capital "T" or small "t" were clear cases of trade-mark recogni-

tion. The results of the survey show that approximately one-third answered "Thermos" in one form or another.

In view of the fact that any conclusion in this area cannot be reduced to a figure of unimpeachable accuracy but must, at best, be an approximation, the result of the plaintiff's survey may be said to be somewhat corroborative of the court's conclusion based upon other evidence in the case, except that such other evidence indicated a smaller minority of the adult populace which recognized the trade-mark significance and use of "Thermos". This may be because of the nature of the survey question which left little or no opportunity for the revelation of a generic or descriptive use of "thermos" in the answer.

The interviewers, many of whom testified, appeared to have done their work honestly and conscientiously and with commendable detachment. The weight of the results, however, must be somewhat adversely affected by the poor design of the question to show the existence or non-existence of generic use and by the fact that most of the interviewees, at least those who testified, appear to have had a higher than average educational and economic status, and thus did not constitute a representative cross-section of the consumer public. On the plaintiff's theory, however, it was only interested in showing that trade-mark recognition of "Thermos" existed in a recognizable section of the populace.

Those interviewees who gave what the plaintiff considered a helpful answer on the survey question and who testified in court, had been interviewed by counsel prior to testifying and were generally aware of the issues. They appeared emotionally conditioned to want to assist the plaintiff in preventing the defendant from taking away from the plaintiff what they felt was its rightful trade-mark. For what it is worth, the plaintiff's survey may be said, in addition to what was mentioned above, to corroborate what the plaintiff has sought to prove, and that is, that there is an appreciable minority segment among consumers who recognize, know and rely upon "Thermos" as a trade-mark of the plaintiff's products.

The survey or poll conducted by Sindlinger & Company for the defendant sought to comply with the prerequisites and principles governing the reception of survey evidence in "Handbook of Recommended Procedures for the Trial of Protracted Cases" adopted by the Judicial Conference of the United States, March, 1960. The court is satisfied that this poll or survey was conducted in accordance with those standards.[8] The results of the survey were that about 75% of adults in the United States who were familiar with containers that keep the

---

8. The key questions asked 3,300 interviewees were:

"Are you familiar with the type of container that is used to keep liquids, like soup, coffee, tea and lemonade, hot or cold for a period of time?

"Have you yourself ever used (or filled) such a container—that is, the type to keep liquids cold or hot?

"What was the occasion for using such a container?

"If you were going to buy one of these containers tomorrow—that is, the type that keeps food and beverages hot or cold—what type of store would you select to make your purchase?

"What would you ask for—that is, what would you tell the clerk you wanted?

"Can you think of any other words that you would use to ask for a container that keeps liquids hot or cold?

"If you were going to describe one of these containers to a friend of yours— what words would come to your mind first to describe a container that keeps liquids hot or cold?

"Do you, or does anyone else within your household own a container such as we have been talking about?

"How many are owned by all members of your household?

"What do you call this (these) containers?

"Do you know the names of any manufacturers who make these containers that keep liquds hot or cold?

"Can you name any trade-marks or brand names that are used on these containers?"

contents hot or cold, call such a container a "thermos"; about 12% of the adult American public know that "thermos" has a trade-mark significance, and about 11% use the term "vacuum bottle". This is generally corroborative of the court's conclusions drawn from the other evidence, except that such other evidence indicated that a somewhat larger minority than 12% was aware of the trade-mark meaning of "thermos"; and a somewhat larger minority than 11% used the descriptive term "vacuum" bottle or other container. The subject matter does not lend itself to conclusions of precise mathematical accuracy; but the survey appears to have been conducted according to recognized scientific principles and methods, which have been tested and found successful in the marketing field.

The court was particularly impressed with the high degree of credibility of the interviewers who testified, their conscientiousness in carrying out their duties and their complete lack of bias. They did not know the purpose of the survey as it related to the trial; they did not know when they conducted the interviews, for whom the survey was being made or that it was to be used in litigation; they had never talked with the attorneys nor had they been interviewed or given any instructions by them; and, as each took the stand, she had no knowledge of what the trial was about. Here and there in the testimony it was brought out that some human error had occurred in a particular interview, but an adequate allowance had been made for such error in computing the results of the poll.

The defendant's theory of the law is that a generic use of "thermos" by a large majority of consumers will place the word in the public domain regardless of the existence of a recognizable group or minority of consumers which has awareness of and uses "Thermos" as a trade-mark.

*The Claims of Law*

The nature and method of presentation of the evidence by each of the parties,
including, as above mentioned, the objectives and means of conducting the respective surveys, has differed, markedly, because each party has acted in accordance with its own concept of the applicable law. The proof offered by both sides supports the conclusion that a very large majority of the consumer public uses "thermos" generically and that there is a fairly substantial minority which recognizes, uses and relies upon "Thermos" as plaintiff's trade-mark. The plaintiff argues that in the light of these factual conclusions it should prevail because the defendant has the burden of showing that "Thermos" has *only* a descriptive use and that to the consuming public *as a whole* "Thermos" has lost *all* of its trade-mark significance. Absent such proof, particularly where the plaintiff has shown some trade-mark use and recognition of the word, the plaintiff claims it is entitled to be protected, under the common law and the Lanham Act, in its exclusive right to the use of the word; and that this is so because so long as the word is a trade-mark to some members of the public there remains the possibility that someone may be deceived. In substance its position is based in part upon the law of New York in which the leading case is Selchow v. Baker, 93 N.Y. 59, 68, 69 (1883) in which the court said:

> " * * * where a manufacturer has invented a new name consisting of a new word, or a word or words in common use, which he has applied for the first time to his own manufacture or to an article manufactured for him, to distinguish it from those manufactured and sold by others, and the name thus adopted is not generic or descriptive of the article, its qualities, ingredients or characteristics, but is arbitrary or fanciful and is not merely to denote grade or quality, he is entitled to be protected in the use of that name, notwithstanding that it has become so generally known that it has been adopted by the public as the ordinary appellation of the article."

See also Artype, Inc. v. Zappulla, 228 F.2d 695 (2 Cir.1956). The plaintiff also relies upon Marks v. Polaroid Corp., 129 F.Supp. 243, 270 (D.Mass.1955) in which the court, in seeking to distill the substance of the Cellophane and Aspirin cases (DuPont Cellophane Co. v. Waxed Products Co., 85 F.2d 75, (2 Cir. 1936); and Bayer Co. v. United Drug Co., 272 F. 505 (S.D.N.Y.1921), said:

"* * * a defendant alleging invalidity of a trade-mark for genericness must show that to the consuming public as a whole the word has lost all its trade-mark significance. * * *" and

"Where the possibility of some deception remains real and the need of competitors to satisfactorily describe their products is satisfied by the availability of several common nouns or adjectives suitable for that purpose, this Court will protect the interest of the owner in his trade-mark."

The defendant, however, relies upon the Aspirin and Cellophane cases, supra, and the Shredded Wheat case, which is Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938), as enunciating the governing law which, it claims, applied to the facts of this case, call for the conclusion that "thermos" is descriptive and has passed into the public domain.

In discussing the issue in the Aspirin case Judge Learned Hand said:

"The single question, as I view it, in all these cases, is merely one of fact: What do the buyers understand by the word for whose use the parties are contending?"

Judge Hand found that buyers in the trade understood "Aspirin" to be a trade name but he went on to say:

"The crux of this controversy * * * lies not in the use of the word to these buyers, but to the general consuming public, composed of all sorts of buyers from those somewhat acquainted with pharmaceutical terms to those who knew nothing of them. The only reasonable inference from the evidence is that these did not understand by the word anything more than a kind of drug to which for one reason or another they had become habituated."

It appears that the Bayer Company had itself used "Aspirin" "as though it was a general term"; and the only alternative generic terms were "acetyl salicylic acid" or "monoaceticacidester of salicylicacid" which were practically unknown to and not readily usable by the consuming public. After it became apparent to the Bayer Company that it was in danger of losing its trade-mark right to "Aspirin", it made a special effort to protect its trade-mark but the court held:

"If * * * [the buyers] * * * understand by it only the kind of goods sold, then, I take it, it makes no difference whatever what efforts the plaintiff has made to get them to understand more."

Consideration was given to the fact that some members of the general public, as distinguished from those in the trade, recognized and used "Aspirin" as the plaintiff's trade-mark. Nevertheless Judge Hand found "Among consumers generally the name has gone into the public domain," and that therefore the plaintiff had lost its trade-mark right.

The opinion in the Cellophane case was written by Judge Augustus Hand with Judge Learned Hand also sitting. In dealing with the question whether or not the word "cellophane" had passed into the public domain the court said:

"* * * The real problem is what is meant to the buying public during the period covered by the present suit. In other words, did it simply mean a transparent glycerinated cellulose hydrate regenerated from viscose, and nothing more, or did it mean such an article of commerce manufactured by or originating with the complainant?"

**24**

The Court observed that:

"The course of conduct of the complainant and its predecessors, and especially complainant's advertising campaign, tended to make cellophane a generic term descriptive of the product rather than of its origin and, in our opinion, made it so to at least a very large part of the trade."

While the Court of Appeals disagreed with some of the factual conclusions and the conclusions of law of the trial court, the subordinate facts of the Cellophane case as found by the trial judge are of interest in comparing the present case with it.

From the evidence presented, the trial court found (D.C., 6 F.Supp. 859, 863) that there were several descriptive words available and in use for referring to the product sold by the plaintiff under the mark "DuPont Cellophane" and that "Cellophane" was a coined word. Some of the descriptive terms were "transparent cellulose wrapping", "cellulose", "transparent", "transparent paper" or "transparent wrapping material". These terms were used by plaintiff's competitors in conjunction with their own trademarks, such as "Kodapak", "Sylphrap", "Protectoid" or "Krystal Klear", and were well known to the trade. None of plaintiff's competitors used "Cellophane" in advertising or describing their goods. However, once the plaintiff's consumer advertising had become effective, other advertisers stated that their products were "Wrapped in Cellophane", "Cellophane Wrapped" and the like. When such advertising became fairly extensive, plaintiff began to protest such uses of the word and followed a short time later with protests to publishers and others who had used or were using the word in a less than satisfactory manner. Its policing activities embraced alleged misuses in the Patent Office. There was at least one dictionary definition of "Cellophane" and it mentioned the fact that it was a trade-mark. In its own advertising, both trade and consumer, plaintiff included trade-mark notices and used descriptive words.

In the present case as in Cellophane the plaintiff itself inaugurated and disseminated the use of "thermos" as a synonym for "vacuum insulated" and as a noun standing for the name of the product and it failed to use reasonable diligence to keep it from the public domain. Toulmin, Trade-Mark Handbook, Chapter XIII, § 141, § 142, § 143 (1957).

The plaintiff, DuPont Company, had, as noted, endeavored to reeducate the public so that it would know that "cellophane" was not a generic term but the registered trade-mark of the plaintiff. With regard to this the Court of Appeals said:

"It, therefore, makes no difference what efforts or money the DuPont Company expended in order to persuade the public that 'cellophane' means an article of DuPont manufacture. So far as it did not succeed in actually converting the world to its gospel it can have no relief."

It recognized that a minority used and recognized the word "cellophane" as the plaintiff's trade-mark, and dealt with this circumstance as follows:

"In the present case the word 'cellophane' ordinarily signifies the cellulose product we have been discussing and nothing more, but to certain persons it is probable that it means the complainant's goods. * * * The defendant should be allowed to use the word cellophane unconditionally in dealing with those to whom it means no more than the product and should be able to fill orders for cellophane received from such persons either with Sylvania cellophane or any other cellophane. But as the complainant's use of the word 'cellophane' has had a wide publicity, there may be some persons who desire DuPont cellophane. Accordingly, it seems to us in the interest of justice that, when filling orders for cellophane, the defendant should state that the product sold is

Sylvania cellophane or the cellophane of whomsoever may be the maker, and need state nothing more."

█ In general the principles of the Aspirin and Cellophane cases apply to the facts of the present case. It is true that the alternative generic terms in the case of Aspirin were not as understandable to persons other than those in the chemical business nor, in the Cellophane case, did the alternative generic names for cellophane probably have the amount of consumer use which has been acquired by "vacuum insulated bottle", "vacuum jacketed bottle" and "vacuum bottle". However, these alternatives for "thermos", even though they have been used over the years by plaintiff's competitors in the trade, never gained wide acceptance by the consumer public in everyday use; the first two, though fully descriptive, were too long; and the term "vacuum bottle" smacked of the scientific laboratory and never gained anything more than minor public acceptance. The plaintiff almost completely ignored these generic terms during the first sixteen crucial years when it was educating the consumer public to use the word "thermos" as a name for or description of its product. There are also probably more people who may have known the meaning of vacuum insulated, vacuum jacketed or vacuum bottle than the few who may have known the alternative terms for aspirin and cellophane. It is also likely that the minority of the consumers who know, recognize and rely upon "Thermos" as a trade-mark exceed the minority which knew "Aspirin" to be a trade-mark and used it as such; and it may, to a less extent, exceed the minority which recognized and used the word "Cellophane" as a trade-mark. However, while the burden of proof is on the defendant to prove that "thermos" has passed into the public domain, the Aspirin and Cellophane cases do not require that the defendant prove that "to the consuming public as a whole the word has lost all its trade-mark significance" in the sense that there must not be left any minority

at all, no matter how small, which is still aware of and uses the word in its trade-mark significance. So long as the great majority of consumers use "thermos" generically and the American public, almost universally, *understands* what is meant by "thermos", used descriptively, when they see or hear it regardless of whether or not they themselves use "thermos" in its trade-mark sense or whether or not they use some other term for the particular product, it does not matter precisely what the relative sizes of the minorities were in the Cellophane case and in this case.

In American Chicle Co. v. Topps Chewing Gum, 2 Cir., 208 F.2d 560, 562, the court, in an opinion by Judge Learned Hand, said:

"* * * 'publicizing' the plaintiff's nuggets as 'Chiclets' has fixed the word in the minds of many buyers as meaning no more than a candy coated gum nugget; and to some degree destroyed it as a trade-mark. That is a peril to which all such advertising is subject; its very success may prove its failure.

"We may properly assume, therefore, that, although the defendant's 'makeup' is not 'likely to cause confusion' among attentive buyers, there is a substantial minority, 'likely' to be misled. If we were to read the statute literally, such a minority would be enough, for the text does not limit infringement by the number of those who may be misled. However, we do not read this statute as *tabula rasa*; we construe it in the background of the law as it stood in 1946; and that law defined the issue of infringement less literally. On all but the most extreme occasions it involved a balance of two conflicting interests: that of the 'owner' of the mark to prevent the diversion of prospective customers as opposed to that of the putative infringer to be free to compete for them." (footnotes omitted)

Where as here there is a great majority of the consumer public which uses the

word "thermos" generically and at the same time a fairly substantial minority which recognizes and uses and relies upon the plaintiff's trade-mark "Thermos", the law of the Aspirin and Cellophane cases does not say that that ends the matter and that judgment should enter for the owner of the trade-mark. The court must then proceed to consider whether a declaration that the word "thermos" has become a part of the public domain will create a likelihood that members of the consumer public may be deceived because they may thereby be induced to buy the defendant's or some other manufacturer's product of vacuum insulated ware as and for the vacuum insulated ware of the plaintiff, or whether the decree of the court can preserve the characteristics of the plaintiff's trade-mark and at the same time so limit the generic use of "thermos" that there is no likelihood of such deceit.

"(1) A designation which is initially a trade-mark or trade name ceases to be such when it comes to be generally understood as a generic or descriptive designation for the type of goods, services or business in connection with which it is used.

"(2) To the extent that a designation of the kind described in Subsection (1) retains its significance as a trade-mark or trade name, its use as such is protected as far as it may be practicable without impeding the use of the designation by others in its generic or descriptive significance." Restatement, Torts § 735 (1938).

In the Cellophane case the court quotes from a portion of the case of Ford v. Foster, (1872) L.R. 7 Ch.App. 611, in which Mellish, L., J., said:

"Then what is the test by which a decision is to be arrived at whether a word which was originally a trade mark has become publici juris? I think the test must be, whether the use of it by other persons is still calculated to deceive the public, whether it may still have the effect of inducing the public to buy goods not made by the original owner of the trade mark as if they were his goods. If the mark has come to be so public and in such universal use that nobody can be deceived by the use of it, and can be induced from use of it to believe that he is buying the goods of the original trader. * * * the right to the trade mark must be gone." 85 F.2d 75, at 82.

In applying this to the Cellophane case the court did not construe it to mean that there could not be found to be a generic use of cellophane if there were a minority which recognized it as a trade-mark, nor did it conclude that "Cellophane", as a trade-mark must be gone and utterly abolished. Instead of adopting the rigid and inflexible rule of Selchow v. Baker, supra, and the interpretation of the Aspirin and Cellophane cases which the court applied in the Polaroid case, both of which the plaintiff relies upon, the court in the Cellophane case adopted a flexible approach which decreed the word to be neither wholly trade-mark nor generic without limitation.

The risk that consumers may be deceived stems from the opportunity for confusion. The court was faced with this possibility in both the Aspirin and Cellophane cases because there were found to be minorities in both instances who desired to buy the respective trademarked products of the plaintiff manufacturers. This is the class of people on whom deception might be practiced. In those cases the decrees were designed to protect them from deception by placing certain conditions and limitations on the generic use of the words in issue.

 If there is likely to be confusion among reasonably careful purchasers, the court need not have before it evidence of actual instances of confusion. It is a matter for the court to determine from the circumstances of each case. See La Touraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, at p. 117 (2 Cir.1946) and cases there cited; see also Judge Frank's dissent in that case at page 124.

The reasons for permitting any generic use of "thermos" under the circumstances of this case are to permit the natural enrichment of the language and to prevent the plaintiff from maintaining a monopoly of the word with the result that consumers who use it generically and to whom defendant's or other manufacturers' products are acceptable or even especially desirable, are almost always offered the trade-mark product of the plaintiff by the retailers. There was evidence that there exists the potential for injustices resulting from such unfair competitive disadvantages. This arises also from a kind of confusion which stems from the very existence of the generic use of "thermos" by a great majority of the consumer public and from the understanding of the descriptive use of the word "thermos" by nearly everyone. However, on a balancing of the considerations of competitive disadvantage to the defendant against the risk that a minority of consumers who know, recognize and use "thermos" as a trade-mark may be deceived, the latter must be given primary consideration and it is only in the event that the possibility of confusion engendering such deceit can be removed that consideration can be given to the danger of plaintiff's monopoly as a reason for allowing the defendant and others to use "thermos" generically.

The court is here of the opinion that risk of confusion can, as in the Cellophane case, be eliminated by limitations and conditions imposed upon the generic use of "thermos" so that there will be no likelihood that anyone can or will be deceived by such generic use. If, as in the Cellophane case, the defendant were required to precede each use by it of the word "thermos" by the possessive of the name "Aladdin", plus (at its option) any of its brand names as: Aladdin's thermos or Aladdin's Huckleberry Hound thermos; and if, in addition, it were required to confine its use to lower case through-out, as "thermos", and at no time were permitted to use the word with an initial capital "T" and; if the

size and style of the type used must be the same for all seven letters of the word and at no time be larger in size than any of the letters of other names with which, or of the letters of words in the same phrase, clause or sentence in which, it is used; and if the defendant is prohibited from using in its labeling, advertising or publication releases the words "genuine" or "original" or any other words or phrases synonymous therewith, relating to or referring to the word "thermos", the possibilities of deception would be eliminated. It should also be understood in connection with these limitations that defendant's use of "thermos" must invariably be preceded by "Aladdin's", partly in order that "thermos" will never appear as the first word of a sentence, and, therefore, a phrase such as "thermos bottle by Aladdin" will not be acceptable. It should be further understood that any orders which might be received by the defendant in which the buyer uses the word "thermos" in any of its forms, unmodified by "Aladdin's" or "your" or other reference to, or designation of, the defendant, the defendant must, in filling the order, include a notice to the buyer that the order is being filled by Aladdin's thermos, followed by the defendant's number of the product or part.

The plaintiff has eight registered trade-marks for the word "thermos" which it has adopted during its history from 1908, each of which identifies itself with one of three different forms: the first is characterized by an initial capital "T"; the second is a form of stylized capitals, " THERMOS "; and the third is of capitals, all of the same size, "THERMOS". Under the limitations of the decree the plaintiff will retain the exclusive right to the use of all of its present forms of the trade-mark "Thermos" without change. Therefore, those consumers who desire to buy the trade-marked products of the plaintiff can identify them by exactly the same trade-marks that they have always seen. This circumstance together with the limitations on generic use provided by the de-

cree will prevent confusion in its use and insure against the possibility that any members of the consumer public will be deceived.

Settle order for judgment on the complaint and counterclaim in accordance with this opinion, with costs taxed in favor of the defendant.